## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WESTCODE, INC.** | : | |
| Goshen Corporate Park | : | |
| 1372 Enterprise Drive | : | |
| West Chester, PA  19380 | : | No. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **DIGITRONICS INVENTIONEERING CORP.** | : | |
| Northway 10 Professional Park | : | |
| Clifton Park, NY 12065 | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

**AND NOW**, comes the Plaintiff, Westcode, Inc. ("Westcode"), by and through its attorneys, to respectfully request the entry of an order vacating, correcting or modifying the arbitration award entered in the action captioned, Digitronics Inventioneering Corp. ("Sixnet") v. Westcode, Inc., and in support thereof, avers the following:

**I.     PARTIES**

1.     Westcode is a Pennsylvania corporation with a facility situated at Goshen Corporate Park, 1372 Enterprise Drive, West Chester, PA  19380.

2.     Sixnet is, upon information and belief, a Delaware corporation with a facility situated at Northway 10 Professional Park, Clifton Park, NY 12065.

**II.    JURISDICTION**

3.     Jurisdiction over this matter is conferred by 9 U.S.C.A. §1, et seq. and 28 U.S.C.

§ 1332(a).

## III.   BACKGROUND OF THE UNDERLYING DISPUTE

4.      Westcode is in the business of supplying and assembling various sub-components such as heating, ventilation and air conditioning systems and door operator systems for use in subway and rail cars.

5.      In or about March, 1995, Daimler Chrysler Rail Systems (North America), Inc. ("Adtranz") entered into a contract with BART to refurbish and rehabilitate 200 of BART's model "A" and "B" rail cars ("the BART project").  BART also had an option to have Adtranz refurbish and rehabilitate 239 rail cars after the first 200 rail cars were completed for a total of 439 rail cars.

6.      The BART project required, among other things, that the refurbished rail cars have new heating, ventilation and air conditioning ("HVAC") systems installed, new suspension/pneumatic systems installed, and the existing door operator systems overhauled.

7.      In or about January 1996, Adtranz tendered purchase order number TXS404067 to Westcode for the design and manufacture and installation of 439 car sets of HVAC systems which Westcode accepted in or about December, 1995.  The purchase order incorporated certain terms and conditions referred to as The San Francisco Bay Area Rapid Transit District Rehabilitation of Transit Vehicles Agreement Between AEG Transportation Systems, Inc. and Westcode, Inc., Agreement No. TXS404067 ("the BART Agreement").

8.      Subsequently, on or about February 1, 1996 and June 25, 1996, Adtranz submitted purchase orders to Westcode, respectively, for the design, manufacture and/or overhaul of the suspension systems and the door operator systems.  Westcode ultimately

2

accepted the above-mentioned purchase orders for the suspension project and the door overhaul project.  Westcode was thus the supplier for the suspension system, the HVAC system and the door operator system.

9.     The HVAC systems were to include a temperature control unit ("TCU").  The purpose of the TCU was to monitor and control the performance of the HVAC system.

10.     The door systems were required to include a door diagnostic unit (DDU").  The DDU was to monitor (but not control) the door operating system.  Both the TCUs and DDUs required customized software as well as hardware.

11.     Sixnet was selected as Westcode's sub-supplier for the DDUs and TCUs.  On or about January 18, 1996, Westcode and Sixnet entered into an agreement titled Temperature Control Unit Supply Agreement ("TCU Supply Agreement") and an agreement titled Door Diagnostic Unit Supply Agreement ("DDU Supply Agreement").

12.     Westcode's purchase order number P-40165 was issued for the TCUs on or about March 22, 1996.  Similarly, Westcode's purchase order number P-40616 was issued for the DDUs on or about the same date.

13.     With the exception of technical requirements and specifications for the products, the two Supply Agreements are nearly identical.  The provisions of the two agreements that are pertinent to this matter will be discussed in more detail below.

14.     First and foremost, Article 2.10 of both the TCU Supply Agreement and the DDU Supply Agreement is what is generally referred to as a "flow through" provision in that it incorporated, by express reference, various prime contract documents, among others, and listed those documents in order of their priority to the contract.  Specifically, Article 2.10 of

3

the TCU Supply Agreement provides as follows:

### 2.10   Related Documents

The following documents are incorporated as terms of this contract, and are listed in order of precedence:

1.   Purchase Order Change Orders
2.   **Original Purchase Order**
3.   **Temperature Control Unit Supply Agreement**
4.   **Westcode Specification W1185-ER-011, issue 1 and applicable documents**
5.   Westcode Software requirement Spec (W1185-S-001) Issue 1
6.   BART Conformed Contract Book, 41MF-110A
7.   RTPS-BABA T 6015 Rev B
8.   BART FIMS Vehicle Interface Control Documents
9.   IEEE 730 Standard for Software Quality Assurance Plan
10.  Westcode Quality Plan
11.  Westcode Software Quality Assurance Plan
12.  ATS Vehicle Level EBTU Tester and Power Bench Tester, dated 7/31/95 (20 sections)
13.  AEG Transportation Systems Subsystems Specification Document, Integrated Electronics Bench Test Unit
14.  AEG Transportation Systems Subsystems Specification Document, Digital test subsystem for integrated EBTU
15.  AEG Transportation Systems Subsystems Specification Document, Digital Subsystem for EBTU
16.  **SIXNET proposal dated 12/21/95**
17.  SIXNET Field Service Agreement

(emphasis added)

15.    The DDU supply agreement is generally identical to the TCU supply agreement except that it incorporated DDU specifications such as W1110-ER-024, Issue 1.

16.    In keeping with the flow through of, and the order of precedence of, the various contract documents, the sources for the product specifications were numerous.  First, the purchase order, Article 1.b provides as follows:

4

> By acceptance of this order, seller agrees to be bound by, and to comply with, all of the terms and conditions of this order including any amendments thereto and all specifications and other documents referred to in this order... .

17.    Article 1.1 of the TCU Supply Agreement as to the design of the TCU hardware, provided that the TCU would comply with the pertinent design specifications.

18.    The contract specifications provided that the temperature range of both the performance of the vehicle and its subsystems was to be 20 ° F to 120 ° F.

19.    Electronic componentry also comes with manufacturer ratings or specifications which, among other things, guarantee that a component will perform under certain specified conditions such as temperature extremes.

20.    A commercial rating is generally 32°F to 158 ° F. The industrial rating is generally -40°F to 185°F.

21.    Under some circumstances a component may be qualified for use at a temperature range beyond its manufacturer specifications by qualification testing.  It is important to note at this point that the contracts in this case, however, prohibited the use of electrical components not properly rated, in the first instance, by the manufacturer and prohibited sub-suppliers from using inferior componentry under the guise of qualification selection or screening.

22.    Screening and qualification testing is the process where components, not rated to perform to specifications by their respective manufacturers, are otherwise qualified.

23.    Screening and qualification testing was not permitted under the BART Conformed Contract.

24.     The contract specifications required that the selected components be rated by their manufacturers to the industrial range.

25.     In Article 2.5 of the Agreements, Sixnet expressly warranted that the product would be free from defects in both material and workmanship.

26.     The BART conformed contract contained detailed termination provisions. Those provisions, by virtue of the flow through provision, were expressly incorporated by reference, into the TCU and DDU Supply Agreements.

27.     The contract contained a typical default termination provision which made both the failure to supply products according to schedule and the supply of products, improper quality, defaults under the contract.

28.     Just as important, however, was a termination-for-convenience clause which gave the buyer the right to terminate any or all of the subcontracts when it was determined by the buyer to be in the buyer's best interest.

29.     Sixnet, by its performance, breached the TCU and DDU Supply Agreements in several respects.

30.     The TCUs and the DDUs both suffered from critical component specification and functionality problems.

31.     First, a total of 58 TCU burn-in tests were performed on Sixnet products. Of that amount, nearly one-quarter failed the burn-in tests and were returned.

32.     The high burn-in failure rate naturally led to a closer examination of the TCUs themselves. This examination revealed that Sixnet was using electronic component parts that were not properly rated by the manufacturers to perform at the required temperature extremes.

33.    Adtranz was well aware of the fact that the component parts on Sixnet's products were non-conforming.  Adtranz, of course, held its supplier, Westcode, accountable.

34.    The DDUs share the same fundamental problems as experienced by the TCUs. The DDUs were failing the burn-in test at a high rate.  The DDUs also contained substandard componentry.

35.    While Westcode desired that the hardware portions of Sixnet's contracts be fulfilled by Sixnet, it had no choice in light of Sixnet's performance but to explore replacement suppliers.  Sixnet made Westcode's decision to procure a substitute supplier for hardware easy when, in September, 1998, Sixnet unilaterally refused to ship any more products.

36.    One week later, on September 18, 1998, after already breaching its delivery obligations and delivering non-conforming product, almost exclusively because of outstanding balances on the projects that were unrelated to the project at hand, Sixnet advised Westcode that it was stopping production and it would make no further deliveries of any products, on any jobs, including TCUs and DDUs, until it was paid in full.

37.    Sixnet was paid in full for all of its Westcode accounts on October 31, 1998. By that time, however, Westcode had no choice but to find a substitute supplier for the hardware portions of the TCU and DDU supply contracts.  No further product at that point was ever shipped by Sixnet for the BART "A" and "B" car jobs.

38.    The substitute hardware supplier, using the same exact specifications that were supplied to Sixnet was able to produce acceptable product.

39.    Sixnet's performance created discord and strife between Adtranz and Westcode that turned out to be irreparable.

7

40.     Primarily because of the problems created by Sixnet, Adtranz eventually terminated all three Westcode purchase orders in full on or about May 19, 1999.  Adtranz possessed termination-for-convenience rights but felt that Westcode's performance, through Sixnet, was so bad that a termination for default was warranted.

41.     The termination resulted in litigation in both Philadelphia, Pennsylvania and Pittsburgh, Pennsylvania.

42.     On or about February 7, 2000, Adtranz filed a complaint in the Court of Common Pleas of Allegheny County in the matter captioned, <u>Daimler Chrysler Rail Systems, Inc. v. Westcode, Inc.</u>, C.C.P. Allegheny County, G.D. No. 00-1552.

43.     In its action Adtranz asserted claims for breach of contract, breach of warranty and misrepresentation.  Adtranz' Complaint included claims that the HVAC and door systems were not delivered pursuant to the contract schedules and they were not in conformance with contract requirements.

44.     On September 28, 2000, Westcode filed an action in the United States Court for the Eastern District of Pennsylvania against Adtranz captioned, <u>Westcode, Inc. v. Chrysler Daimler (North America), Inc.</u>, U.S.D.C. E.D. Pa. No. 00-cv-4928.

45.     The gravamen of Westcode's claims were for misuse of Westcode's design drawings and the wrongful termination of the purchase orders.  The litigation between Westcode and Adtranz settled on or about May 31, 2001.

46.     The settlement of the litigation with Adtranz left Westcode substantially in a deficit position because of the termination.

47.     Both Westcode (because of Sixnet) and Sixnet were eventually replaced as

suppliers on the BART project.

48.     Sixnet has been paid for all of the products that were delivered.

49.     Westcode and Sixnet's termination claims were ultimately submitted to ADR Options, Inc. pursuant to an Arbitration Agreement and Stipulation dated November 27, 2002. A true and correct copy of the Arbitration Agreement and Stipulation is attached hereto as Exhibit "A".   Pursuant to the Arbitration Agreement and Stipulation, ADR Options, Inc. was selected as arbitration forum.

50.     ADR Options, Inc.'s offices are at Two Commerce Square, Suite 1100, 2001 Market Street, Philadelphia, PA 19103.

51.     By the time discovery had commenced on the arbitration, all of the TCUs and DDUs that had been supplied by Sixnet, and delivered to ADtranz, had been scrapped by ADtranz because of the fact that the components used in those subassemblies did not comply with the contract specifications.

52.     Notwithstanding the fact that this action was commenced by Sixnet, Sixnet purged the manufacturing and testing records which would have revealed the componentry that was used on the TCUs and DDUs, and would have revealed what testing, if any, had been done to approve the use of substandard componentry.

53.     On November 1, 2002, Westcode filed a motion seeking relief because of Sixnet's spoliation of critical design and manufacturing evidence.  A true and correct copy of the November 27, 2002 Order is attached hereto as Exhibit "B".

54.     By Order dated November 27, 2002, the Arbitrator ruled that the motion was denied without prejudice pending proof that the spoliation of the design records harmed

9

Westcode.  As Sixnet had destroyed the design records and production records of the products that had been supplied and manufactured, the whole proceeding was corrupted and Westcode's ability to present a case was severely prejudiced.

55.     As to, for example, the design and testing phase of the product, which is a phase that the Arbitrator placed great emphasis on in his Opinion, the case turned into a rank swearing contest by Sixnet's representatives.  Sixnet's representatives argued, without any documentation to support their argument, or any documentation available to Westcode to probe the argument, that the substandard components utilized in the few remaining subassemblies and pieces of subassemblies that were available at the time of the arbitration, were actually contained in design copies of the products.  While there was evidence which undermined the integrity of that contention, Westcode was substantially prejudiced by not having the design records or the production records available.

56.     As mentioned above, the design phase of the product is a circumstance which the Arbitrator placed heavy reliance on in determining that the subassemblies were contract compliant.

57.     Westcode believes that the circumstantial evidence irrefutably proves that the contention that the substandard components were approved for use in the design of the product is false.  In fact, as a matter of law, the design phase of the product, in light of the clear contract language, is legally meaningless.

58.     Nevertheless, the Arbitrator placed great emphasis on that phase of the product and to the extent the Arbitrator's position had any merit, the design and production documents, which would have shown temperature ratings of the components that were used,

10

and whether they complied with the contract specifications, were critical.

59.     The arbitration itself was held from December 2 through 4, 2002.

60.     In particular, the Supply Agreements called for product to withstand temperature extremes of 20° F to 120°F.  Sixnet's representatives even admitted that the Sixnet TCUs and DDUs incorporated components with manufacturer specifications that did not meet the contract specifications for temperature extremes.

61.     Unrefuted evidence showed that there were numerous commercially rated components used in the Sixnet products.

62.     According to Sixnet engineer, Gary Lewis, the decision to use components in the TCUs and DDUs with substandard manufacturing specifications was based on, and allegedly supported by, qualification testing that Sixnet admitted was prohibited but that allegedly occurred during the design phase of the product.

63.     Mr. Lewis contended that such testing proved the suitability of the substandard components to perform at the contract temperature range notwithstanding the manufacturer's specifications.  Mr. Lewis could not identify exactly what the testing consisted of or how many components had been pre-tested.

64.     Consistent with Mr. Lewis' admissions, the evidence that was available disclosed:

    a.     Gary Lewis, Sixnet's design engineer on the BART
           TCU/DDU project, testified at his deposition that
           Sixnet did use a number of components, specifically
           on the BART TCUs and DDUs, that had
           substandard manufacturer specifications. Mr. Lewis
           could not recall just how many components of that
           type were used on BART TCUs and DDUs or why
           they were used but he testified that some sort of
           qualification testing was definitely done on these

components in connection with the decision to use them on the BART products (as opposed, of course, to the so-called "standard" product).

b.    There were numerous examples, from the various boards still in existence, where different pieces of the same board contained not only the same component with different manufacturer ratings, but some components were from different manufacturers and, for that matter, different countries. (11 out of 15 integrated circuits on the TCU CPU at Westcode were commercial) (out of 13 identical DDU boards 7 U4 components were industrial and 6 were commercial) and (U4 and U5 components were found from 3 different manufacturers from 3 different countries).

c.    The decision to use at least commercially rated Motorola semiconductors, as opposed to the industrially rated Motorola semiconductors was based purely on the fact that the commercially rated component was cheaper.

d.    Some of the components found in the assembled TCU produced at the hearing by Sixnet did not match counterpart components found in the boards that remained in Sixnet's inventory.

65.    At the conclusion of the arbitration, a briefing schedule was set. In accordance with the briefing schedule, all briefing was concluded by February 3, 2003.

66.    Further, according to the Rules the Award should have been provided within ten (10) days of the arbitration. ADR Options, Inc. Rules and Procedure, No. 13, a true and correct copy of which is attached hereto as Exhibit "C". However, in light of the briefing schedule requested by the parties, the time for issuing the Award was extended to accommodate the briefing.

67.    Notwithstanding the foregoing, the Arbitrator's Award was issued on July 22,

2003.  A true and correct copy of the Findings of Fact, Conclusions of Law and Arbitration Award and is attached hereto as Exhibit "D".

68.      According to the Award, the Arbitrator found in favor of Sixnet, against Westcode, in the amount of $1,075,911.60.

69.      In his Award, the Arbitrator completely ignored the contract's express warranty provisions and ruled on the basis of a warranty of merchantability theory.

70.      The Award is manifestly flawed because it completely ignores, among other things, the basic and fundamental contract design specifications, in particular the specification criteria for the selection of components, and the unrefuted evidence that the products supplied did not meet that criteria.

71.      The Arbitrator also awarded significant and substantial compensatory consequential damages to Sixnet despite clear and unambiguous contractual limitations on such a recovery.

72.      The Arbitrator's Award is also fatally flawed, and in fact shows evident partiality, in regards to numerous factual determinations that ignored the unrefuted evidence in the record, and relied on evidence that should not have been part of the record and numerous legal conclusions that ignored undisputable legal precedent.  The Arbitrator also ignored and misapplied numerous procedural rules of ADR Options including, but not limited to, the rules requiring the application of substantive law and procedural rules to the case.

73.      Westcode renewed its motion regarding the spoliation of critical design and production documents at the conclusion of the case, in its post arbitration briefs and that motion was never decided.

13

74.     ADR Rule and Procedure number 13 also prohibits an arbitrator from imposing delay damages or interest unless the parties agree in advance and in writing that such prevailing party would be entitled to an award of that nature.

75.     Notwithstanding the foregoing ADR rule, interest was awarded by the Arbitrator in an amount exceeding $164,00.00.

76.     The aforementioned Award should be vacated pursuant to statutory and non-statutory grounds including, but not limited to, that the Award was:

      a.     arbitrary and capricious;

      b.     the Arbitrator exceeded his powers in so imperfectly executed his powers that a mutual, final and definite award on the subject matter submitted was not made;

      c.     the Arbitrator is guilty of conduct by which the rights of the Plaintiff have been prejudiced;

      d.     there was evident partiality in the Arbitrator;

      e.     an award was procured by corruption, fraud or undue means;

      f.     the Award does not draw its essence from the party's contract;

      g.     the award was entered in manifest disregard of the law; and

      h.     the award was entered in manifest disregard of the record.

**WHEREFORE**, the Plaintiff, Westcode, Inc. respectfully requests the entry of an Order vacating, correcting or modifying the Arbitration Award.

Respectfully submitted,

**PHILLIPS & CAMPBELL, P.C.**

_____
Patrick C. Campbell, Jr.
ID No. 53350
One Belmont Avenue, Ste. 518
Bala Cynwyd, PA 19004
610/668-4970
Attorneys for Plaintiff, Westcode, Inc.

**Dated:**          July 23, 2003