## I. INTRODUCTION

In this case, Westcode, Inc. ("Westcode") retained the services of Digitronics Inventioneering Corp. ("Sixnet") to supply electronic monitoring devices for a rail car refurbishing project for the San Francisco Bay Area Rapid Transit Authority ("BART"). The products that were supplied did not conform to the contractual design specifications in that they contained components that were not rated to perform to the contractual temperature specifications. Accordingly, Sixnet was replaced. While pursuing a litigation claim for damages for wrongful termination, Sixnet actually destroyed the design and production documents related to its use of non-compliant components. Notwithstanding the unrefuted evidence in the record regarding the component substitution, and the fact that all of the component substitution records had been destroyed, the Arbitrator not only permitted Sixnet to present its claims but put Westcode in the impossible position of having the prove the flaws in Sixnet's designs

and/or the component substitution without the critical, incisive, design and production records. To make matters worse, the Arbitrator actually, based on nothing more than anecdotal testimony by interested witnesses, ruled that Sixnet did not breach the parties' contracts and awarded Sixnet $1,075,911.60. This Award should be vacated because, among other things, the Arbitrator exceeded his powers, imperfectly executed his powers, ignored clear and undisputable law, made numerous mistakes regarding unrefuted material facts and imposed an improper remedy. In addition, the Arbitrator permitted the whole process to be corrupted by Sixnet's destruction of critical design and production records.

## II.    SUMMARY OF RELEVANT FACTS

The unrefuted evidence in this case establishes that in or about March, 1995, Daimler Chrysler Rail Systems (North America), Inc. ("Adtranz") entered into a contract with the San Francisco Bay Area Rapid Transit Authority ("BART") to refurbish and rehabilitate 200 of BART's model "A" and "B" rail cars ("the BART project"). BART also had an option to have Adtranz refurbish and rehabilitate 239 rail cars after the first 200 rail cars were completed for a total of 439 rail cars. The BART project required, among other things, that the refurbished rail cars have new heating, ventilation and air conditioning ("HVAC") systems installed, new suspension/pneumatic systems installed, and the existing door operator systems overhauled.

In or about the early part of January 1996, Adtranz tendered purchase orders to Westcode for the design and manufacture and installation of HVAC systems, suspension systems and door operator systems. The purchase orders incorporated certain terms and conditions referred to as The San Francisco Bay Area Rapid Transit

2

District Rehabilitation of Transit Vehicles Agreement Between AEG Transportation Systems, Inc. and Westcode, Inc., Agreement No. TXS404067 ("the BART Agreement").

The HVAC systems were to include a temperature control unit ("TCU"). The purpose of the TCU was to monitor and control the performance of the HVAC system. The door systems were required to include a door diagnostic unit (DDU"). The DDU was to monitor (but not control) the door operating system. Both the TCUs and DDUs required customized software as well as hardware.

Sixnet was selected as Westcode's sub-supplier for the DDUs and TCUs. On or about January 18, 1996, Westcode and Sixnet entered into an agreement titled Temperature Control Unit Supply Agreement ("TCU Supply Agreement") and an agreement titled Door Diagnostic Unit Supply Agreement ("DDU Supply Agreement"). Westcode's purchase orders were issued to Sixnet on or about March 22, 1996.

The BART contract specifications required that the components used on the subassemblies be rated on the basis of their respective manufacturer data sheets to perform at the temperature range of 20° F to 120° F. Electronic componentry comes with manufacturer ratings or specifications which, among other things, guarantee that a component will perform under certain specified conditions such as temperature extremes. The "commercial rating" is generally 32° F to 158 ° F. The "industrial rating" is generally -40°F to 185°F. Industrially rated components were required by the specifications under the BART contract.

The BART conformed contract contained detailed termination provisions. Those

provisions, by virtue of the flow through provision, are expressly incorporated by reference, into the TCU and DDU Supply Agreements. The contract contained a typical default termination provision which made both the failure to supply products according to schedule and the supply of products of improper quality, defaults under the contract. Just as important, however, was a "termination-for-convenience" clause which gave the buyer the right to terminate any or all of the subcontracts when it was determined by the buyer to be in the buyer's best interest.

The TCUs, the DDUs suffered from critical component specification and functionality problems. As set forth above, among the pertinent contract specifications were the following:

- To perform in temperature extremes of 20°F to 120°F;

- To contain component parts that were guaranteed, without qualification screening or testing, to perform at the contractually specified temperature extremes.

Nearly 25% of the TCUs supplied by Sixnet failed contract burn-in testing. The high burn-in failure rate naturally led to a closer examination of the TCUs themselves. This examination revealed that Sixnet was using electronic component parts that were not properly rated by the manufacturers to perform at the required temperature extremes. In other words, the inspection revealed that Sixnet was using components with a commercial rating.

The issue of the use of non-compliant components first surfaced in or around August, 1998 when Pierre Zuber was sent in by Adtranz to help determine the cause of the high burn-in failures. In his August 13, 1998 memorandum, Mr. Zuber noted the presence of non-conforming components in the TCUs and DDUs.

Mr. Zuber's findings, of course, led to Westcode's first written request, on August 31, 1998, for back-up materials certifying Sixnet's previous representation that his component manufacturers all "guaranteed the temperature range on the components".

Brandywine Management, an independent consulting firm, was then brought in to investigate the problem.  In Brandywine's September 23, 1998 Interim Hardware Engineering Report, Brandywine also noted that the TCUs and DDUs utilized components not rated by their respective manufacturers to perform within the required temperature ranges.  Brandywine's suggestion was that Sixnet should (1) identify the non-compliant components; and (2) produce manufacturing ratings for those components; or (3) replace those components.

It was based on the Brandywine Report, that Westcode, by letter dated September 24, 1998, advised Sixnet:

> As you can see we are in a situation that we need to work through this problem, as all SIXNET product is now under scrutiny.  Without the proper documentation (per the supply agreements) including the rating date on the components, we cannot confirm and defend the design of the production units on both the TCU and DDU on any of the product delivered to date.
>
> You recognize that we want you to build more units, however, as much as we need more units we will not pay for units that are no spec compliant and we will not accept more units that we cannot verify that the product is compliant.

The September 24th letter also confirmed a conversation that a Westcode vice president had with a Sixnet engineer wherein the Sixnet engineer admitted that Sixnet had in fact supplied boards that deviated from approved designs.

Having been told by Sixnet engineers that the boards had changed from the First

Article, and having found through two separate, independent inspections, non-compliant components, Westcode, at the suggestion of Brandywine, asked to review the design data on the components. Sixnet refused to produce documents relating to the manufacturer ratings of its components.

Sixnet's Gary Lewis, admitted that Sixnet's TCUs and DDUs incorporated components with manufacturer specifications that did not meet the contract specifications for temperature extremes. Sixnet's admissions aside, Westcode's inspections also found numerous commercially rated components in the design. Adtranz, the prime contractor, would not, under any circumstances, issue a final acceptance for Sixnet's TCUs or DDUs with the non-compliant commercial grade componentry.

Westcode was not an end user of Sixnet's defective products. In order to keep production moving, the products were obviously turned over to the customer, Adtranz.

Because they were non-conforming, the products shipped to Westcode were only conditionally accepted (the condition being that they would be replaced) by Adtranz in order to keep the production moving. All of the BART A and B car, and SEPTA, Sixnet products had to be scrapped and replaced.

On July 30, 1998, Adtranz sent Westcode a notice of intent to terminate the Westcode/Adtranz purchase orders for default. Sixnet's faulty performance was a the primary cause for the action taken by Adtranz.

Westcode immediately forwarded the Adtranz default letter to Sixnet and clearly and unequivocally put Sixnet on notice of the critical need to cooperate and the consequences if cooperation was not forthcoming.

By August 21, 1998, Westcode was taking concrete steps to begin to address the alleged defaults under the Adtranz contract caused by Sixnet. Particularly, Westcode took over the software portion of the DDU and TCU supply agreements.

The takeover was accomplished by virtue of the August 21, 1998 Modification Agreements and Conditional Release entered into by Sixnet and Westcode. Brandywine Management was selected as the sub-supplier to complete the software portions of the DDU and TCU supply contracts.

While the software portions of the contracts were transferred to a new vendor, problems with the components used on the hardware were surfacing. While Westcode desired that the hardware portions of Sixnet's contracts be fulfilled by Sixnet, it had no choice in light of Sixnet's performance, but to explore replacement suppliers. Sixnet made Westcode's decision on whether to procure a substitute supplier for hardware easy when, on September 18, 1998, Sixnet unilaterally refused to ship any more products.

Sixnet was paid in full for all of its Westcode accounts on October 31, 1998. By that time, however, Westcode had no choice but to find a substitute supplier for the hardware portions of the TCU and DDU supply contracts.

On October 13, 1998, Westcode retained PCI to complete the DDU and TCU hardware. Using the same specifications that were supplied to Sixnet, PCI was able to produce product for the BART A and B car job that conformed to contract specifications.

On December 9, 1998 Adtranz notified Westcode that it was actually taking over

the DDU/TCU hardware portions of its contract with Westcode.  Adtranz actually took over the hardware portions of the DDU and TCU supply agreements by letter agreement dated January 19, 1999.  That January 19, 1999 Agreement completely ended any involvement Westcode had in the supply of DDUs and TCUs for the BART A and B car rehabilitation project.  As of that date, Westcode had no use for TCUs and DDUs.  Adtranz, of course, did not want to use Sixnet TCUs and DDUs because of the component problems.

Sixnet's performance created discord and strife between Adtranz and Westcode that turned out to be irreparable.  Adtranz eventually terminated all three Westcode purchase orders in full on or about May 19, 1999.  The termination by Adtranz was occasioned primarily by the problems created by Sixnet's performance.

## III.    THE PROCEDURAL BACKGROUND OF THE WESTCODE/SIXNET LITIGATION

Sixnet commenced the action styled, <u>Digitronics Inventioneering Corp. v. Westcode, Inc.</u>, State of New York, Supreme Court - Appellate Division, Index No. 99-1395 on June 14, 1999.  By agreement of the parties, the claims were submitted to arbitration by ADR Options, Inc.

The Arbitration was conducted from December 2-4, 2002.  After extensive post-hearing briefing including the submission of proposed findings of fact and conclusions of law, by Award issued July 15, 2003, in Philadelphia, Pennsylvania, the Arbitrator found in favor of Sixnet in the amount of $1,075,911.60 which represented lost profits and interest thereon.

## IV. THE UNREFUTED EVIDENCE OF NON-CONFORMING COMPONENTS PRODUCED AT THE ARBITRATION HEARING

All of the product manufactured by Sixnet and delivered to Westcode were ultimately delivered to and then scrapped by Adtranz. There were not, therefore, any delivered items available for inspection in this litigation. There were, however, a few remaining I/O boards in Sixnet's inventory. Consistent with Sixnet's admissions, the review of remaining product disclosed unrefuted evidence at the hearing of the substitution of commercial grade components.

First, a Sixnet engineer on the BART project, Gary Lewis testified that components were used on the products that were not rated by their respective manufacturers to perform within the contract temperature range of 20°F to 120°F. Mr. Lewis could not recall just how many components of that type were used on BART TCUs and DDUs or why they were used.

Inspection of the remaining boards showed not only substandard component temperature ratings, but some components were from different manufacturers and, for that matter, some were even from different countries.

The component part substitution in some instances was widespread. By way of example, inspection revealed that 11 out of 15 integrated circuits on one set TCU boards were commercial as opposed to industrial.

Inspection also revealed that some of the components found in the only assembled TCU produced at the hearing by Sixnet did not match counterpart components found in identical unassembled boards that remained in Sixnet's inventory.

There was, therefore, not only a use of substandard commercial grade components, but there was also component variation among the boards themselves.

## V. SIXNET'S DESTRUCTION OF DESIGN AND PRODUCTION RECORDS

Sixnet, at all times, refused to produce any documentation regarding the manufacturers' alleged certifications that components were properly rated. The claims and counterclaims in this case center around Sixnet's performance under TCU and DDU Supply Agreements dated January 18, 1996. At the forefront of Sixnet's performance, was the delivery of non-conforming products. Sixnet's President, Steve Schoenberg, and one of its former engineers, Gary Lewis, both admitted during their depositions that the Sixnet TCUs and DDUs incorporated components with manufacturer specifications that did not meet the contract specifications for temperature extremes.

At his deposition, Mr. Schoenberg stated that a document identified as an "issue listing" would identify the components that were used in the different batches of product shipped to Westcode. Mr. Schoenberg also testified that the testing that would have been done to allegedly qualify the substandard componentry would have been documented in design notes.

By letters dated July 2, 2002 and September 3, 2002 from counsel for Westcode to counsel for Sixnet, the above-mentioned documents, as well as any other documents which could assist in identifying the components used in the products shipped as well as Sixnet's alleged engineering analysis which allegedly supported the decision to use substandard components, be produced. By letter dated August 12, 2002, counsel for Sixnet advised counsel for Westcode that all test records had been destroyed.

The delivered products are gone. They were conditionally released to Westcode's customer Adtranz despite substantial non-conformities so that the production line could keep moving. The only proof of what components actually went into those products would have been the issue listing.

Sixnet commenced this litigation by filing a complaint on June 14, 1999 and therefore was obliged to preserve evidence relating to its performance under the contract. Further, litigation aside, Article T.6.8.A. of the BART Conformed Contract, again, which was incorporated into the Sixnet Supply Agreement, required sub-suppliers to maintain records required to provide evidence of the quality of its sub-systems.

Despite repeated contract requests for information certifying the quality of the components in Sixnet's products, despite having a contractual obligation to maintain and provide such documentation, and despite itself having commenced this litigation knowing full-well that the quality of the components would be a major issue in the case, Sixnet destroyed the documents which could establish how many components in each batch of products were sub-standard, which components in each batch of product were substandard and what testing was allegedly done to qualify those substandard components for use in the products.

On November 1, 2002, Westcode filed a motion seeking relief because of Sixnet's spoliation of critical design and manufacturing evidence. By Order dated November 27, 2002, the Arbitrator ruled that the motion was denied without prejudice pending proof that the spoliation of the design records harmed Westcode.

As Sixnet had destroyed the design records and production records of the

products that had been supplied and manufactured, the whole proceeding was corrupted and Westcode's ability to present a case was severely prejudiced.

As to, for example, the design and testing phase of the product, which is a phase on which the Arbitrator placed great emphasis in his Opinion, the case turned into a rank swearing contest by Sixnet's representatives. Sixnet's representatives argued, without any documentation to support their argument, or any incisive documentation or other evidence available to Westcode to probe the argument, that the substandard components utilized in the few remaining subassemblies and pieces of subassemblies that were available at the time of the arbitration, were actually contained in design copies of the products. While there was evidence which undermined the integrity of that contention, Westcode was substantially prejudiced by not having the design records or the production records available.

Without the design documents, the futility into which the Arbitrator permitted the proceeding to turn, can best be exemplified in an exchange between Westcode's counsel and Mr. Schoenberg during an examination of some of the remaining physical product during the hearing. The examination centered around the fact that two identical boards contained similarly placed components made by different manufacturers, with different temperature ratings. When counsel for Westcode asked Mr. Schoenberg to identify whether the components made by different manufacturers were both contract compliant, he stated that they "most certainly" are. Since, obviously, the temperature certification documents had been "destroyed", counsel for Westcode asked Mr. Schoenberg how he could make such a statement with such certainty. The explanation was:

I know they are interchangeable because they are both
qualified parts or they wouldn't be on those boards.

The same circular logic applied when Mr. Schoenberg was presented with three boards
with identical component parts manufactured by three different manufacturers from
three different countries.

Westcode renewed its motion for spoliation sanctions on December 31, 2002
during the post-arbitration briefing. That motion was never decided.

The design phase of the product is a circumstance on which the Arbitrator
placed heavy reliance in determining that the subassemblies were contract compliant.
The circumstantial evidence irrefutably proves that the contention that the substandard
components were approved for use in the design of the product is false. In fact, as a
matter of law, the design phase of the product, in light of the clear contract language, is
legally meaningless in regards to component selection criteria for production units.
Nevertheless, the Arbitrator placed great emphasis on that phase of the product and to
the extent the Arbitrator's position had any merit, the design and production documents,
which would have shown temperature ratings of the components that were used, and
whether they complied with the contract specifications, were critical.

The Arbitrator ruled that Westcode's claim that Sixnet's products were non-
compliant was false because the product had obtained a First Article approval and the
products were tested. The only evidence the Arbitrator could have relied on was the
anecdotal testimony by Mr. Schoenberg to the effect that the components were
compliant otherwise Sixnet would not have used them. If Westcode was going to be
put to the task of challenging such a circular argument, it had no footing absent Sixnet's

design and production documents. Westcode, however, should never have found itself in a position of having to disprove the Sixnet's design without the design documents. Accordingly, the Arbitrator should never have permitted Sixnet's case to proceed or, in the alternative, Sixnet' claims should have been dismissed or denied at the conclusion of the hearing when the extent of Westcode's prejudice became manifestly clear.

## VI.    SUMMARY OF THE ARBITRATOR'S DECISION

The Arbitrator found that Sixnet was not in breach of any of its contractual obligations. In so doing, the Arbitrator either did not address Westcode's express warranty defenses or the Arbitrator must have ruled that the product supplied by Sixnet was somehow contract compliant. The contractual specifications with which the Arbitrator would have had to have concluded the product complied were never identified. The Arbitrator then awarded Sixnet "contract compensatory (Hadley v. Baxendale) damages" in the amount of $1,075,911.60. The amount of the award includes interest from July 15, 2001 in the amount of $164,122.11.

The Arbitrator did not anywhere in the Award address the effect of the termination-for-convenience provision which was incorporated into the parties' Agreement. As mentioned above, the Arbitrator never decided Westcode's renewed motion for spoliation. In fact, not only was Sixnet not sanctioned as a result of the its destruction of the design and production records but, indeed, the inferences deducible from the lack of such documentation most definitely went to the spoliator - Sixnet.

**VII.  LEGAL ANALYSIS**

**A.  THE STANDARD FOR VACATING AN ARBITRATION AWARD**

**1.  The Deference Afforded Arbitrators is not Unlimited**

While arbitrators today are given a great amount of deference, they are not given carte blanche.  John Morrell & Co. v. Local Union 304A, United Food and Commercial Workers, 913 F.2d 544, 559 (8th Cir. 1990) (quoting Piggly Wiggly Operators Warehouse v. Piggly Wiggly Operators Warehouse Independent Truck Drivers Union, Local 1, 611 F. 580, 583 (5th Cir. 1980), cert. den., 500 U.S. 905 (1991).  In greater detail below, we will discuss the bases for reviewing and vacating commercial arbitration awards.

Because of the role it plays in industrial governance, judicial deference to an arbitrator's decision in the labor context is much stronger than the deference afforded an arbitrator's decision in the commercial context.  See, Huber, Hunt & Nichols, Inc. v. United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local 38, 282 F.3d 746, 754 (9th Cir. 2002) cert. den. 123 S.Ct. 342 (2002); Louisiana Pacific Corp. v. International Brotherhood of Electrical Workers AFL-CIO, Local Union 2294, 600 F.2d 219, 223 n. 10 (9th Cir. 1979).  Hence, it is not surprising that some of the grounds that will be discussed have been cross-pollinated from the labor arbitration field.

Before proceeding further to discuss standards for vacatur, it is important to recognize the very atypical nature of the parties' Arbitration Agreement in this case.  Under well recognized law, the terms of the parties' Arbitration Agreement is what

determines the scope of review.

Generally, arbitrators are not bound by formal rules of procedure and evidence, and the standard for judicial review of arbitration procedures is merely whether a party to arbitration has been denied a fundamentally fair hearing. See, Graham's Service, Inc. v. Teamsters Local 975, 700 F.2d 420, 422 (8th Cir. 1982). However, Federal Courts invoke the Federal Arbitration Act ("the FAA) primarily to give effect to contracting parties' expectations for resolving disputes. Dluhos v. Strasberg, 321 F.3d 365, 369 (3rd Cir. 2003). Accordingly, the FAA revolves around the interpretation of the parties' arbitration agreement. Id.; see also, Harrison v. Nissan Motor Corp., 111 F.3d 343, 350 (3rd Cir. 1997).

> **2.** **The Terms of the Parties' Arbitration Agreement Obligated this Arbitrator to Correctly Apply the Relevant and Substantive Law to Determine the Outcome of the This Case**

Obviously, in order to define the parties' expectations, and, accordingly, the Arbitrator's duties and obligations, it is essential to review the terms of the Arbitration Agreement itself. Here, the Arbitration Agreement contained several extremely unique provisions which are set forth in pertinent part as follows (emphasis added):[1]

---

[1]

The parties agreed to arbitration pursuant to the ADR Options Rules. The rules in question are from the ADR Options Rules of Procedure, a copy of which is attached to the undisputed record as Exhibit "SS".

## 1.    *Scope*

These rules, as in place at the time of proceeding, shall govern all arbitration proceedings in ADR Options.

These rules may be modified or voided by agreement of all parties. This agreement to arbitrate is an agreement for common law arbitration unless the parties agree expressly in writing for arbitration pursuant to the Uniform Arbitration Act, a similar statute or other contractual term(s).

**Rulings on legal issues are based on the principles of law which would be applicable if the case were heard in the appropriate court of public jurisdiction.  This may be changed by agreement of all parties to the dispute.**

\*    \*    \*

## 4.    *Proceedings*

Proceedings are either arbitrations or mediations.

a.    **Standard arbitrations are binding in nature and offer the opportunity to present evidence in a manner similar to a non-jury trial in the public courts.**

\*    \*    \*

## 6.    *Discovery*

**The parties shall have the right to take depositions and to obtain discovery based on the discovery rules of the public court in which the case had been previously filed, or if no case is pending, then discovery shall be governed by the local Rules of Civil procedure of the appropriate court of public jurisdiction.** Notwithstanding the above, the scope and time for discovery may be modified by agreement of the parties and the ADR Options arbitrator.

\*    \*    \*

## 9.    *Evidence*

**Rules of Evidence of the appropriate court of public jurisdiction shall apply unless otherwise agreed by the parties.**

*10.    Substantive Law*

**The law of the case shall be the substantive law of the appropriate jurisdiction.  In the event of a dispute as to the applicability of substantive law, all parties shall submit briefs to the ADR Options arbitrator, who shall decide the appropriate law of the case.**

As can be seen from the above-quoted rules, the parties in this case did not bargain for typical arbitration.  In this case, the parties by virtue of the arbitration provisions to which they agreed, clearly bargained for processes that more closely resembled litigation than arbitration.  The parties bargained for a proceeding that allowed for discovery, the exchange of documents, and depositions.  The parties also bargained for a proceeding that required the Arbitrator to apply the pertinent procedural and substantive rules and law in reaching an outcome.  If the Arbitrator failed in those obligations (which he did) then he breached the Agreement and exceeded his powers.

**3.      The Standards for Vacatur Under the
Federal Arbitration Act**

With the terms of the Arbitration Agreement as background, it is now appropriate to turn to the vacatur standards.  Article 10 of the Federal Arbitration Act provides, in pertinent part, as follows:

(a) In any of the following cases the United States Court in and for the District wherein the award was made may make an order vacating the award upon the application of any party to the arbitration:

(1) where the award was procured by corruption, fraud or undue means;

(2) where there was evident
partiality or corruption in the
arbitrators, or either of them;
(3) where the arbitrators were
guilty of misconduct in refusing to
postpone the hearing, upon
sufficient cause shown, or in
refusing to hear evidence
pertinent to and material to the
controversy; or of any other
misbehavior by which the right to
the parties have been prejudiced;
or

(4) where the arbitrators
exceeded the powers, or so
imperfectly executed them that a
mutual, final and definite award
of the subject matter submitted
was not made.

9 U.S.C. § 10(a).

A party urging vacatur on the grounds of evident partiality must produce specific

facts to show that the alleged partiality is "direct, definite and capable of demonstration

rather than remote, uncertain or speculative".  Ergobuilt, Inc. v. Neutral Posture

Ergonomics, Inc., 2002 WL 1489521, p. 5 (N.D. Tex.) (relying on Mantle v. Upper Deck

Co., 956 F.Supp. 719, 729 (N.D. Tex. 1997)).

Misconduct warranting the vacatur of an award under Section 10(a)(3) need not

amount to bad faith but rather misconduct born of indiscretion.  Newark Stereotypers

Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 598 (3d Cir. 1968) cert.

den. by 393 U.S. 594 (1968).  The misconduct in question must amount to a denial of a

fundamentally fair hearing.  Rocke v. Local 32b-32j Service Employees Union, 755

F.Supp. 622, 624 (S.D.N.Y. 1991) see also, Newark Stereotypers Union, supra at 599.

Arbitrators "exceed their powers" under the FAA when they fail to meet their obligations as specified in the arbitration agreement. Western Employers Insurance Co. v. Jefferies & Co., Inc., 958 F.2d 258, 261 (9th Cir. 1992) (relying on Western Canada SS Co. v. Cia. DeNav. San Leonardo, 105 F.Supp. 452 (S.D.N.Y. 1952)). In the Western Employers Insurance Co. case, for example, the parties' arbitration agreement required that the award be accompanied by statements containing findings of fact and conclusions of law. The award was rendered in a manner that did not include any findings of fact or conclusions of law. In vacating the award, the court in that case found that the parties had a right to an arbitration according to the terms for which they contracted. The court recognized that the purpose of the FAA required courts to enforce the terms of the privately negotiated agreements to arbitrate, like any other contracts. Id. at 261. Although findings of fact and conclusions of law are not arbitration requirements generally, because of the terms of the particular arbitration agreement in that case, by failing to comply with those terms, and by failing to provide findings of fact and conclusions of law, the court found that the arbitrators had exceeded their powers under Section the Act. See also, New Elliott Corp. v. MAN Gutehoffnungshutte AG, 969 F.Supp. 13, 15 (S.D.N.Y. 1997).

In order to determine whether arbitrators exceed their powers, this Court should employ a two step analysis: (a) the form of the award must be rationally derived either from the agreement between the parties or from the parties' submission to the arbitrators, and (b) the terms of the award must not be completely irrational. Mutual Fire Marine & Inland Ins. Co. v. Norad Rains Co., Ltd., 868 F.2d 52, 56 (3rd Cir. 1989).

Among the other grounds for vacatur which have evolved from the FAA are:

1.  the award is arbitrary or capricious;

2.  the award does not draw its essence from the underlying contract; or

3.  the award is in manifest disregard of the law.

See, <u>Williams v. CIGNA Financial Advisors, Inc.</u>, 197 F.3d 752, 758 (5th Cir. 1999) <u>cert. den.</u> 529 U.S. 1099 (2000) (collecting cases); <u>Harris v. Parker College of Chiropractic</u>, 286 F.3d 790, 792 n. 1 (5th Cir. 2002); <u>Dluhos v. Strassberg</u>, 321 F.3d 365, 372 (3rd Cir. 2003) (manifest disregard of the law); <u>Local 683 International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Jersey Coast Egg Producers, Inc.</u>, 773 F.2d 530, 534 (3rd Cir. 1985) <u>cert. den.</u> 475 U.S. (1986); <u>Ergobuilt, Inc. v. Bodybuilt, Inc.</u>, 2002 WL 1489521 (N.D. Tex.); <u>Weinberg v. Silber</u>, 140 F.Supp.2d 712, 717 (N.D. Tex. 2001) <u>cert. den.</u> 475 U.S. 1085 (1986).

An award is arbitrary and capricious when it is so palpably faulty that no judge, or group of judges, could ever conceivably have made such an award. <u>Safeway Stores v. American Bakery & Confectionary Workers Local 111</u>, 390 F.2d 79, 83 (5th Cir. 1988); see also, <u>Alabama Education Association v. Alabama Professional Staff Organization</u>, 655 F.2d 607, 609 (5th Cir. 1981). The award must exhibit a wholesale departure from the law or not be grounded in the contract which provides for the arbitration. <u>Brown v. Rauscher Pierce Refsnes</u>, 994 F.2d 775, 781 (11th Cir. 1993).

The "essence" test requires a court to determine whether the arbitrator's award was so unfounded in reason and fact, so unconnected with the wording and purpose of the arbitration agreement as to manifest an infidelity to the obligation of the arbitrator. <u>Executone Information Systems, Inc. v. Davis</u>, 26 F.3d 1314, 1325 (5th Cir. 1994). In

making this inquiry, the question is whether the award, however arrived at, is rationally

inferrable from the contract.  Id. (relying on Anderman/ Smith Operating Co. v.

Tennessee Gas Pipeline Co., 918 F.2d 1215, 1219 (5th Cir. 1990).

Under the manifest disregard standard, the governing law ignored by the

arbitrators must be well defined, explicit and clearly applicable.  The error must have

been obvious and capable of being readily and instantly perceived by the average

person qualified to serve as an arbitrator.  Moreover, the term "disregard" applies if the

arbitrator appreciates the existence of a clearly governing legal principle but decides to

ignore it or pay no attention to it.  Merril Lynch Pierce Fenner & Smith, Inc. v. Bobker,

808 F.2d 930, 933-934 (2nd Cir. 1986); Prestige Ford v. Ford Dealer Computer

Services, Inc., 324 F.3d 391, 395 (5th Cir. 2003); Merril Lynch Pierce Fenner & Smith,

Inc. v. Raford, 903 F.2d 1410, 1413 (11th Cir. 1990); M&C Corp. v. Erwin, Behr, Gmbh

& Co., KG, 87 F.3d 844, 850 (6th Cir. 1996); Marshall v. Green Giant Co., 942 F.2d 539,

550 (8th Cir. 1991); see also, Smith v. PSI Services II, Inc., 2001 WL 41122 (E.D. Pa.);

and Kennington, Ltd., Inc. v. Wolgin, 1998 WL 221034 (E.D. Pa.); and Ruggiero v. A.R.

Barron & Co., Inc., 1996 WL 179980 (E.D. Pa.).  A court may infer that the arbitrator

manifestly disregarded the law if it finds that the error made by the arbitrator is so

obvious that it would be instantly perceived by the average person qualified to serve as

an arbitrator.  Willemijn Houdsteramaatschappij BV v. Standard Microsystem, 103 F.3d

9, 13 (2d Cir. 1997).

An arbitration award must also be vacated if it is unsupported by the record.

News America Publications, Inc. v. Newark Typographical Union Local 103, 918 F.2d

21, 24 (3rd Cir. 1990) reh. den. 921 F.2d 40 (1990).  When the critical facts underlying

the arbitrator's decision are conceitedly wrong, the award cannot stand.  Long Electronics Corp. of America v. International Union Local 272, 492 F.2d 1255, 1257 (1st Cir. 1974).  Where the record demonstrates an unambiguous and undisputed mistake of fact and the record demonstrates strong reliance on that mistake by the arbitrator in making his award it can be fairly said that the arbitrator exceeded his powers or so imperfectly executed them that vacation may be proper.  National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders v. United States Postal Service, 751 F.2d 834, 843 (6th Cir. 1985) (relying on 9 U.S.C. § 10(d)).

Because of the unique nature of the Arbitration Agreement in this case, the Arbitrator was obligated to proceed in this matter as if he was a judge presiding over a non-jury trial.  He was also obligated, expressly by the parties' Agreement, and implicitly by the nature of his role as a judge in a non-jury proceeding, to correctly interpret the contract and law, and apply it to the facts in the record.  There is no question of credibility here because the facts that are critical to the outcome of the case are not in dispute.  The Arbitrator in this matter did not discharge his obligations to the parties, he breached his obligations under the Arbitration Agreement, he disregarded the law, he disregarded the undisputed facts in the record and he decided the case on theories that were not submitted to him.  For those reasons, the Arbitrator exceeded his powers, so imperfectly executed his powers and allowed the process to become corrupted thereby warranting that the Award be vacated.

**B.    THE AWARD IN THIS CASE MUST BE VACATED**

      **1.    To the Extent that the Arbitrator Determined that Sixnet's Products Conformed to the Contract Temperature and Component Selection Specifications He Ignored the Record, Mainfestly Disregarded the Applicable Undisputed Law, and His Decision Was Based on Critical Facts Which Were Wrong**

          **a.    The Parties' Agreement Included, By Virtue of the Flow Through Provision of the TCU and DDU Supply Agreements, Among Other Things, The Temperature and Component Selection Criteria of the BART Conformed Contract Book**

The Agreement consisted, as the Arbitrator recognized (See, Arbitrator's Conclusions of Law, ¶ 2), of not only the Supply Agreement but the terms of the prime contract between Adtranz and Westcode that were incorporated by virtue of the flow through provision of the Supply Agreements.  Where a contract between a supplier and a sub-supplier incorporates the terms of the prime contract, the sub-supplier is bound by the provisions of the prime contract.   See, <u>Paine Webber v. Bybyck</u>, 81 F.3d 1193, 1201 (2d Cir. 1996) (New York law) (document referred to in contract made part of contract as if incorporated into body); <u>Frommeyer v. L&R Construction Co.</u>, 261 F.2d 879 (3d Cir. 1958); <u>Charles Simkin & Sons, Inc. v. Massiah</u>, 289 F.2d 26, 29-30 (3d Cir. 1961).   See also, <u>Home Lumber Co v. Appalachian Regional Hospitals, Inc.</u>, 722 S.W.2d 912, 914 (Ky. App. 1987) (where prime contract contained arbitration clause,

case remanded to determine if purchase order incorporated terms and conditions of prime contract by reference thereby making dispute between general contract or/and subcontractor arbitrable). The same applies in this case.

The Pennsylvania Superior Court recently addressed the effect and purpose of "flow through" clauses in construction contracts in <u>Bernotas v. Super Fresh Food Markets, Inc.</u>, 2002 WL 31846192 (Pa.Super.) <u>app. grt.</u> 825 A.2d 637 (2003). Specifically in that case a plaintiff was injured in a slip and fall at a supermarket. Work was being done at the time of the accident by a general contractor and a subcontractor. The contract between the owner and the general contractor contained an indemnification clause. The contract between the general contractor and the subcontractor contained a flow through provision incorporating the prime contract.

> The purpose of this type of contract provision, commonly referred to as a "flow through" or "conduit" clause, is to assure that a subcontractor is bound to the prime contractor in the same manner that the prime contractor is bound to the owner. In essence, the provision requires the subcontractor to stand in the shoes of the prime contractor with regard to rights and obligations encompassed in the prime contract to the extent they arise within the purview of the subcontract.
>
> *    *    *
>
> In the case sub judice, [prime contract] obligated [supplier] to indemnify [owner] for any damages that were not caused by [owner's] sole negligence. The subcontract expressly incorporated the terms of the contract documents without qualification, including [prime contract]. [Subsupplier] acknowledged that it had an opportunity to review the contract documents and affirmed that the contract documents were available upon request. Thus, [subsupplier], in effect, agreed to indemnify [supplier] for any damages that were not caused by [owner's] sole negligence that occurred within the purview of the subcontract.

Id. (relying on, *inter alia*, <u>J.&J. Struthers Industries v. Callanan Industries, Inc.</u>, 626 N.Y.S.2d 891 (N.Y. App. Div. 1995) app. den. by 658 N.E.2d 220 (1995)).

Article 2.10 of the Supply Agreements in this case made the purchase orders and the terms/provisions and specifications of the entire BART Conformed Contract part of the parties' agreements.

### b. Pennsylvania Law Applies to the Case

There is a choice of law issue in this case which is, from the standpoint of the outcome of the case, more academic than practical. As will be discussed in more detail below, the law of the two jurisdictions from where the choices could come, Pennsylvania or New York, are substantially identical. The reasoning employed by Arbitrator, however, as it relates to this issue, evinces a clear misapprehension of the record and is in manifest disregard of the law.

The purchase order, which of course was attached as Exhibits to Sixnet's Statement of Claim, contained a backside. The backside contained a provision, Article 19 in particular, which provided that the order should be interpreted according to the laws of the Commonwealth of Pennsylvania. The TCU and DDU Supply Agreements , Article 2.9, in particular, on the other hand provided for disputes to be interpreted under the laws of the State of New York. The flow-through provisions of the Supply Agreements mandated that, in the event of a conflict between the choice of law provisions, the terms of the purchase order take precedence which would have mandated the application of Pennsylvania law.

At the hearing, for the first Sixnet's President, time, Mr. Schoenberg, testified

26

that the purchase order was originally delivered to him by telefax, and according to Mr. Schoenberg, the telefax did not include the general terms and conditions portion of the purchase order. Mr. Schoenberg admitted that Sixnet eventually received a full copy of the purchase order, front and backside, but that he could not recall when. The Arbitrator concluded, that based on this testimony, the terms on the backside of the purchase order were not included as part of the contract.

In dismissing the backside of the purchase order, the key evidence that the Arbitrator completely overlooked was that Sixnet was, at the time it received the BART purchase orders, already a Westcode supplier. Sixnet, by that time, had already received identical purchase orders for other jobs and those purchase orders contained both the front side and backsides with identical general terms and conditions. TR/H/pp. 258-259. Under that scenario, Sixnet had to have had, at the very least, constructive knowledge of the terms and conditions included on the backside purchase orders, if not actual knowledge.[2] Sixnet, therefore, cannot profess ignorance of the terms and condition on the backside of the purchase order when it was issued on the BART projects. The terms and conditions of the purchase order should be part of the contract and Pennsylvania law, therefore, should be applicable to this case, although New York law is substantially identical.

---

[2]

When Sixnet received the backsides of the purchase orders in this case in the form of the full copy, it never rejected, or objected to, the terms and conditions stated therein.

**c.    Sixnet had the Unrefuted Contractual Obligation to Deliver Product that Complied with the Design Specifications Regarding Temperature Ratings and Component Selection Criteria**

The contract documents contained detailed and express specifications relating to the design and performance of the TCUs and DDUs.  Regarding such specifications, the Uniform Commercial Code provides that any affirmations of fact or promise made part of the basis of the bargain creates an express warranty that the goods will conform to the affirmation or promise.  McKinney's U.C.C. § 2-313(a)(I); 13 Pa.C.S.A. § 2313(a)(I); and  Hyland v. First U.S.A. Bank, 1995 WL 595861 (E.D. Pa.).  If the goods do not meet the affirmation, the warranty is breached.  Id.  Technical specifications are types of affirmations or promises that become express warranties.  McKinney's U.C.C. § 2-313; and 13 Pa.C.S.A. § 2313, Official Comment, ¶ 5 (emphasis added).

There are different types of specifications.  A performance specification, for example, requires the contractor to produce a result or means of achieving the particular result.  The contractor is free to determine how to achieve the result.  The risk of non-performance however, is on the contractor.  Fruin-Colnon Corp v. Niagra Frontier Transportation, 180 A.D.2d 227, 585 N.Y.S.2d 248, 253 (1992).  A design specification, on the other hand, specifies materials and methods and impliedly warrants feasability and sufficiency.  The

TR/H/p. 266.

28

contractor must follow the design specifications **without deviation**.  Id.  Once the buyer proves the existence of an express warranty, it is the seller's burden to prove that the products delivered conformed therewith.  See, Borman's Inc. v. Olympic Mills, Inc., 1993 WL 190344, p. 4 (S.D.N.Y.) (N.Y. law).

In contrast to the express warranties, the implied warranty of fitness provides that goods will be fit for any particular purpose for which the seller has reason to know that the goods will be put.    McKinney's U.C.C. § 2-315; 13 Pa.C.S.A. § 2315; Cucchi v. Rollins, 524 Pa. 514, ___, 574 A.2d 565 n.6 (1990).  To establish a claim for breach of an implied warranty of fitness for a particular purpose, there must sufficient evidence that (1) the seller had reason to know of the particular purpose for which the buyer purchased the product; and (2) the seller recommended the product for such purpose, knowing that the buyer was relying on the seller's expertise and skill in making that particular choice.  See, Id. (citing 13 Pa. C.S.A. § 2315 (1984)); Keirs by Keirs v. Weber Nat'l Stores, Inc., 352 Pa.Super. 111, ___, 507 A.2d 406, 410 (1986).  The implied warranty of merchantability means that goods must simply be fit for their ordinary purpose.  See,  McKinney's U.C.C. § 2-314; and see also, Altronics v. Repco, 957 F.2d 1102, 1105 (3d Cir. 1992); and Stratos v. Super Sea Glass, 1994 WL 709375 (E.D. Pa.) (Padova, J.).  Implied warranties do not apply where there are express warranties in the form of contract specifications.  The implied warranties are displaced by the express warranties.  Malul v. Capital City Cabinets, Inc., 191 Misc.2d 399, 740 N.Y.S.2d 828, 834 (N.Y. Civ. 2002).

Professor Anderson, in his commentary to the UCC discussed what must be proven to establish a breach of warranty.  As Professor Anderson notes, in regards to an express

warranty claim in particular, the focus is not on whether the product malfunctions but rather

on whether the product conforms to the applicable contractual specifications.  Professor

Anderson notes:

> It is unfortunate that the warranty law has been so influenced by
> the tort law.  With respect to negligence and strict tort, it is
> logical to require that there be a defect in the goods.  In the
> case of warranty, it should be sufficient to impose liability that
> there has been a breach of warranty.  In many cases, the
> breach of warranty consists of the presence of a defect that
> prevents the goods from being used.  In other cases, the breach
> consists merely of failing to conform to the contract's standard.
> For example, when the seller delivers a red table instead of the
> green table required by the contract there is clearly a breach of
> warranty.  Yet the red table was not defective in any intelligent
> sense of the word merely because it did not conform to the
> contract. * * *.
>
> Many of the cases seek to make a quantitative distinction as to
> how dangerous a product must be in order to be classified as
> 'defective'.  Yet there is not a warranty in the [Uniform
> Commercial] Code that could not be broken by a perfectly made
> product.  Conformity to the standard, satisfaction of the
> minimum criteria of the warranty of merchantability, [and] fitness
> for the particular purpose of the buyer are the criteria for
> determining whether warranties have been satisfied.  Failure to
> satisfy the criteria are the significant matters without regard to
> whether the goods are `defective' or without flaw.
>
> The need for defining a defect becomes unnecessary insofar as
> warranty law is concerned if the matter is approached from the
> aspect of conformity or nonconformity, rather than in terms of
> whether there is a defect.  The presence of a defect should be
> regarded as merely evidence of the fact that the goods are in
> such a condition that some warranty has been broken.  If all the
> circumstances lead to the conclusion that the goods do not
> conform, there is a breach of warranty.  It is unnecessary to
> determine whether what made them not conform is to be
> labeled  a `defect'.

Anderson, Uniform Commercial Code, § 2-314:56 at 163 (1983)); see also, Michael v.

Shiley, Inc., 46 F.3d 1316, 1331 (3d Cir. 1995), cert. den. by 516 U.S. 815, (applying Pa law)

(product need not be defective to be considered breach of express warranty buyer need only

prove that that express warranty was breached); <u>Carl Beasley Ford, Inc. v. Burroughs Corp.</u>, 361 F.Supp. 325, 331 (E.D. Pa. 1973), *aff'd* 493 F.2d 1400 (3d Cir. 1974) (noting that warranty is breached if seller's product fails to conform to promised result); see also, <u>Hyland v. First U.S.A. Bank</u>, supra; and <u>Sagnia-Blythe v. Gamblin</u>, 160 Misc.2d 930, ___, 611 N.Y.S.2d 1002, 1004 (N.Y. Civ. 1994).

In the <u>Michael</u> case, supra, the Third Circuit dealt with the precise issue upon which the Arbitrator mistakenly relied in this case. In <u>Michael</u>, the defendant sold the plaintiff a heart valve. The valve contained an express warranty. The defendant contended that because there was no proof that the valve was defective, there could be no claim for breach of the express warranty. The Third Circuit, rightly so, disagreed. The Third Circuit recognized Professor Anderson's point that an express warranty claim does not require proof of defect or malfunction. Rather, the express warranty claim simply requires proof that the express warranty was breached.

> **d.  Sixnet's Products Did Not
> Conform to the Pertinent Design
> Specifications Because They
> Contained Components That
> Were Not Rated By Their
> Manufacturers To Perform At
> The Temperature Range of 20°F
> to 120°F**

The express warranties at issue in this case are, again, as follows:

- the product had to perform in temperature extremes of 20°F to 120°F; and

- the product had to contain electrical component parts that were rated on the basis of manufacturer data sheets, without pre-screening or qualification testing, to perform within the above-mentioned temperature specifications. TR/H/p. 155 (Schoenberg).

It is admitted Sixnet's products did not conform to the aforementioned warranties.  Mr. Schoenberg admitted, Mr. Lewis admitted, and a visual inspection of the boards themselves showed,[3] that the TCU and DDU boards clearly had components that were not rated by the manufacturer to perform down to 20°F.

There were no waivers obtained by any party in this case to those specifications.  Sixnet's products were, thus, contractually required to conform to these specifications without deviation.  *E.g.*, <u>Fruin-Conlon v. Niagra Frontier Transportation</u>, 180 A.D.2d 227, 585 N.Y.S.D.2d 248, 253 (1992)(contractor must follow design specifications without deviation); see also, 13 Pa.C.S.A. ¶ 2313, Official Comment, ¶ 5.  The use of components that were not rated by their respective manufacturers to conform to the required temperature specifications was an unmistakable breach of express warranty.

### e.    Because Sixnet's Products Were Non-Conforming, Westcode was Entitled to Cancel the Orders

When a seller provides non-conforming product, the buyer may reject the product and/or cancel the contract.  <u>McKinney's U.C.C.</u>, §§ 2-601 & 2-711; 13 Pa.C.S.A. §§ 2601 & 2711.  As to rejecting non-conforming goods, the Commercial Code provides as

---

[3]

Mr. Schoenberg admitted that component classifications and ratings are conspicuous from the face of a board.  Anybody visually inspecting a component who knows what they are looking for can identify what the ratings are.  TR/H/p. 238.

follows:

> § 2601.  *Rights of buyer on improper delivery.*
>
>> Subject to the provisions of this division on breach in installment contracts (section 2612) and unless otherwise agreed under the sections on contractual limitations of remedy (sections 2718 and 2719), if the goods or the tender of delivery **fail in any respect to conform to the contract**, the buyer may:
>>
>> 1.  reject the whole;
>> 2.  accept the whole; or
>> 3.  Accept any commercial unit or units and reject the rest.

13 Pa.C.S.A. § 2-601; see also, McKinney's § 2-601 (emphasis added).  Further, as to cancellation the Code provides in pertinent part:

> § 2711.  *Remedies of buyer in general; security interest of buyer in rejected goods.*
>
>> (1.)  *Cancellation and additional remedies.*  Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole of the breach goes to the whole contract (section 2612 (relating to "installment contract"; breach)), the buyer may cancel... .

McKinney's U.C.C. §2-711; see also, 13 Pa.C.S.A. § 2-711.  A material breach of contract also clearly entitles the non-breaching party to rescind the contract.  *E.g.*, Logan v. Cherrie, 16 Chest. 194 (1967).

Sixnet's performance did not conform to the terms of the contracts.  The products  contained component parts that were not rated to perform at the contractual temperature specifications.  Sixnet's products breached both the express design and performance specifications contained in the contracts. Under § 2711(a), because the product did not conform to the contract specifications, Westcode was fully justified in

rejecting the goods and canceling the contracts.  See,  McKinney's U.C.C. §§ 2-601 &
2-711; 13 Pa.C.S.A. §§ 2601 & 2711(a).

Sixnet also refused, in violation of Article T.16.8.A.3 of the BART Conformed
Contract, to comply with Westcode's requests for design and production records regarding
the temperature performance specifications of the components used in its boards.

Finally, it was also Sixnet who ultimately repudiated the agreements when it
unilaterally stopped delivery and forced Westcode and Adtranz to find an alternate supplier
for the TCUs and DDUs.  Based on the foregoing numerous and material contract breaches
and performance defaults, Westcode was entitled to terminate the Sixnet purchase orders.

> **f.      The Arbitrator Ignored the
>          Undisputed Facts and Law and
>          Found for Sixnet Based
>          Largely on Mistaken Facts and
>          Irrelevant Theories**

Despite what is set forth above, the Arbitrator concluded that the claim that the
Sixnet supplied sub-assemblies failed to meet specifications was not only wrong, but
according to the Arbitrator, was "false".  (Arbitrator's Conclusions of Law, ¶ 5(d)).  The
three bases relied upon by the Arbitrator for making such a conclusion are as follows:

> 1.      The Arbitrator concluded that identical sub-
>         assemblies were given First Article approval;
>
> 2.      The Arbitrator concluded that essentially
>         identical sub-assemblies were supplied to
>         Adtranz and integrated into SEPTA and/or
>         BART cars; and
>
> 3.       The Arbitrator concluded all sub-assemblies
>         by Sixnet were successfully tested by Sixnet
>         before shipment.

In fact, all three bases relied upon by the Arbitrator either ignore unrefuted evidence,

34

find no support in the record, ignore Sixnet's destruction of documents and/or ignore clear unmistakable law.

### i. First Article Approval Did Not Relieve Sixnet of Its Obligations to Supply Products that Conformed to the Contract's Temperature and Component Selection Specifications

First, the Arbitrator completely misapprehended the effect of First Article approval.[4]  First article approval did not immunize the product from either the requirement to comply with all contractual specifications or the obligation to deliver documents during production which verify the compliance with all contractual specifications.

By way of example, Article 15.3.B of the BART Conformed Contract provides that notwithstanding First Article approval, or any other approval for that matter, each subsystem and component is still required to pass acceptance tests to prove its conformity with the relevant contract requirements.  Further, notwithstanding, the issuance of first article approval, in the letter containing the said approval, Westcode made it perfectly clear to Sixnet that:

---

[4]

The Arbitrator concluded that Westcode employed an individual (Frank Welsh) to monitor the design, development and testing of the units and that Mr. Welsh spent 80%-100% of his time working on "the Sixnet designs". (Arbitrator's Findings of Fact, ¶ 20).  Those, however, were not hardware designs.  Mr. Welsh clearly testified that he was **not** at Sixnet for purposes of the design of the product (See, TR/H/p. 30) and that most of his time was spent on software issues as opposed to hardware issues.

> "[N]either review nor approval of any aspect of Sixnet's work
> supplied under the contract shall in any way relieve Sixnet of
> any of its obligations with respect to conformance to
> specifications or the performance of work under the
> contract".

Plaintiff's Exhibit 14. Mr. Schoenberg even admitted in his testimony that First Article

approval did not relieve Sixnet of the obligation of complying with the contract

specifications his product was required to meet regarding temperature ratings.

TR/H/pp. 229, 243 & 246.

First Article approval may give a supplier certain assurances regarding who will be

financially responsible for subsequent design changes but it does not immunize the product

from subsequent scrutiny. It also does not give a supplier carte-blanche to deviate from the

contract requirements and specifications. This case was not about who was responsible for

the financial burden for design modifications. The fact that a first article approval was

issued, therefore, was irrelevant to Sixnet's defense.

> **ii.** **Assuming, <u>Arguendo</u>, That**
> **First Article Approval Could**
> **Relieve Sixnet of The**
> **Obligations to Comply With**
> **Certain Temperature or**
> **Component Selection Criteria,**
> **There Was No Proof That The**
> **Sub-Assemblies that Sixnet**
> **Provided Were Identical to the**
> **First Article**

One point that is clear and unrefuted is that if, as the Arbitrator argued, the

boards were all produced to a First Article design, there would be no deviation among

the boards. As Mr. Schoenberg himself admitted, no deviation among components is

permitted from an approved First Article. TR/H/p. 342.

36

As unrefuted evidence in this case showed, however, there were product deviations among the components used on the same boards. By way of one example, on one particular type of board, out of 13 boards still remaining at the time of this case, 6 contained a component identified as U4 with a commercial rating and 7 contained the same component with an industrial rating.

Westcode also found component differences between the TCU Sixnet introduced as an exhibit in this case and some of the boards which remained in its inventory.

If a commercially rated component was indeed approved for use on a First Article, all of the subsequent production units would have had to have used the same component. There is no way that the variance among boards, with regard to the same components, could be explained on the basis of a First Article approval.

We do not know what components were on the First Article because Sixnet neither saved the First Article itself not did it save the First Article design records. It is certain, however, from the deviations found, among the surviving boards, and from the admissions of Sixnet itself, that the components, whatever they were, changed without obtaining any waivers from Westcode. There was absolutely no factual support for the Arbitrator's conclusion that production products were identical to First Articles.

### iii. The Arbitrator's Contention that Essentially Identical Subassemblies Were Supplied to Adtranz on Other Jobs Ignores the Unrefuted Record Because There Was No Evidence In The Record Regarding The Contractual Specifications for Temperature for Other Jobs In The Record

The Arbitrator concluded that essentially identical sub-assemblies were supplied by Sixnet and "successfully integrated" into other jobs. This argument has absolutely no legal relevance in this case because, first, there was no evidence in the record as to whether the design specifications for the products in the other jobs were identical to the design specifications on the BART job. Second, this point, relied upon by the Arbitrator, highlights that the Arbitrator considered this case to be a warranty of merchantability case as opposed to an express warranty case. The express warranties in the contract displaced any implied warranty. <u>Malul</u>, supra.

Whether an essentially identical product was acceptable on the SEPTA job has no relevance to whether the products supplied on the BART job conformed to the BART contract specifications. Whether the SEPTA job permitted "green tables" is of no relevance. Whether "green tables" worked on the SEPTA job was irrelevant. The BART job at issue in this case clearly required "red tables".

In fact, every time Mr. Schoenberg attempted to testify regarding the use of DDUs (contrary to what the Arbitrator concluded, there were no TCUs supplied on other jobs for Adtranz) on other projects, Westcode objected. See, TR/H/pp. 151 & 171. In

fact, in connection with the colloquy over an objection to Mr. Schoenberg's attempt to introduce testimony that there were "no DDU problems" on the other BART contract, the C-2 project, the fact that the case was about contract specific express warranties, not merchantability, was expressly made. TR/H/p. 173. Professor Anderson's example about the red table and green table was even part of the colloquoy. Id.

Westcode ordered a "red table". At best, Sixnet delivered a "green table". Whether the Arbitrator thought that the "green table" was as good as or better than the "red table" is irrelevant. As Professor Anderson, and caselaw, recognizes, Westcode was not required, indeed was not permitted, to accept anything other than a "red table" regardless of how well made a red table might be. Anderson, Uniform Commercial Code, § 2-314:56 at 163 (1983)); see also, Michael v. Shiley, Inc., 46 F.3d 1316, 1331 (3d Cir. 1995), cert. den. by 516 U.S. 815, (applying Pa law) (product need not be defective to be considered breach of express warranty); Carl Beasley Ford, Inc. v. Burroughs Corp., 361 F.Supp. 325, 331 (E.D. Pa. 1973), aff'd 493 F.2d 1400 (3d Cir. 1974) (noting that warranty is breached if seller's product fails to conform to promised result).

iv.   **Assuming, Arguendo, the Case
      Was an Implied Warranty , as
      Opposed to an Express
      Warranty Case, the
      Arbitrator's Conclusions That
      Essentially Identical Product
      Was  Incorporated Into the
      SEPTA Job is Wrong.**

Factually, contrary to what the Arbitrator may contend, the unrefuted record established that the Sixnet products supplied on the SEPTA job were not "successfully

integrated" into the SEPTA job. As with the job in question in this case. The record quite clearly showed that Sixnet product supplied on the SEPTA job had to be scrapped and replaced. Even if the performance of health monitors for SEPTA was relevant to whether the DDUs and TCUs complied with the BART specifications, the evidence was that the SEPTA health monitors were, indeed, just as unacceptable as the BART products.

<blockquote>
<b>v. The Conclusion that the Sixnet Subassemblies Were All Tested Completely Ignores That Sixnet Destroyed All Of The Test Results</b>
</blockquote>

Lastly, the conclusion that the sub-assemblies were "successfully tested as [sic] Sixnet" flies in the face of the fact that Sixnet destroyed those testing documents. Sixnet admitted that it used non-conforming components. Sixnet claimed that those components were tested. The testing results, indeed documents showing which components themselves were actually tested, were never produced. Without those documents Sixnet could not possibly be deemed to have sustained its burden to prove that its components satisfied the contract specifications. Any finding to the contrary sandbags Westcode.

The error in the Arbitrator's analysis, and the prejudice suffered by Sixnet's destruction of critical documents, cannot be more clearly established then the Arbitrator's conclusion that the components were successfully tested by Sixnet.

**vi.** **Assuming, _Arguendo_, That The Contention That The Commercially Rated Components Had All Successfully Been Qualified To Perform At The Required Temperature Extremes, Qualification Testing Was Not Permitted Under the Contract.**

The BART Conformed Contract, Article T.17.1.B.2, provided the following regarding the required performance specifications of the electronic components (emphasis added):

> 2.     Electrical, electronic and electromechanical parts selection: Selection for parts for contract hardware shall be made on basis of suitability for their applications, proven ability to comply with requirements of the Contract Documents and availability from at least two Suppliers.  Additionally, like parts shall be interchangeable **without selection or screening**.

Not only was screening and qualification testing expressly prohibited, but the contract expressly required that components in the products be rated, in the first instance, on the basis of their respective manufacturer data sheets, to perform to the contract temperature specifications.  See, the BART Contract, Article 17.9.A.1.a & TR/H/pp. 155 & 609.

In that regard, the contract provided as follows:

**17.9   ELECTRICAL MATERIALS**

A.     Electrical, Electronic, and Electromechanical Parts Requirements

     1.     Specifications

a. Each electrical, electronic and electromechanical part shall be selected and controlled on the basis of manufacturers data sheets, catalog cuts, or control drawings that identify the parts physical, environmental, and performance requirements as well as quality and reliability requirements, including inspections and tests for qualification and acceptance, and lot sampling where required.

Even if the components had been tested to perform at 20° F, such testing was prohibited. The contract required that components be selected on the basis of manufacturer ratings, not Sixnet qualification testing.

In finding that the contention that the Sixnet subassemblies were non-compliant was "false", the Arbitrator applied the theory of warranty law that had nothing to do with the case. The Arbitrator also based his decision on facts that were not only not supported by the record, but contrary to unrefuted portions of the record. Assuming, arguendo, that the facts relied upon by the Arbitrator to reach his conclusion were correct, or even supported by the record, the Arbitrator misstated or misapprehended the significance of those alleged facts in light of clear and unambiguous, and undisputed for that matter, contract language.

The facts relied upon by the Arbitrator and the conclusions that he deduced therefrom, were subject to extensive post-arbitration briefing. The Arbitrator's errors,

therefore, cannot be considered mere mistakes, but rather must be the product of a

manifest disregard of the record and the law.  The Arbitrator also, by ignoring the theory

of the case, and by misstating facts and misapplying the law, and ignoring the contract,

breached the obligations imposed upon him by the parties' Arbitration Agreement, so

imperfectly executed those obligations, and exceeded the powers given to him under

the parties' Arbitration Agreement as to require that the Award be vacated.

> **2.  Assuming, <u>Arguendo</u>, that there is any Question Regarding Whether Sixnet's Products Conformed to the Contractual Temperature and Component Selection Specifications, the Arbitrator Exceeded His Powers or so Imperfectly Executed them, by Permitting Sixnet to Even Attempt to Prove the Design of its Product Through Anecdotal Testimony After Sixnet had Destroyed all the Critical Design and Production Records That Westcode was Denied a Fundamentally Fair Hearing**

Sixnet's assemblies admittedly contained components that did not conform to

the contract specifications. Sixnet refused, for so-called "business reasons"[5] to produce

---

[5]

After receiving the August 31, 1998 letter, Mr. Schoenberg testified that he knew that there was an issue regarding the component selection criteria for his products.  He admitted that Westcode was entitled to know the specifications of the components used in his products.  TR/H/p. 223.  His only response as to why the information was not produced was because he did not considered it to be "an appropriate time".  <u>Id.</u> at 223.  Mr,. Schoenberg testified:

> I made a conscious decision that we were not going to respond by doing that engineering work for no compensation".

Mr. Schoenberg contends that he relied on manufacturers to certify the components to operate within the proper temperature range.   TR/H/p. 370.  The problem with that, is, however, that in a job such as this he may have been called upon, and in fact was called upon, to substantiate whether the components he used were contract compliant.  It is no

any documentation regarding the temperature ratings or selection of the components in its products during the contract period.  Sixnet then commenced this litigation, knowing full well that the temperature ratings of these components would be at the crux of this case, and destroyed those documents.

The crux of this case revolved around the components used in the design and production units produced by Sixnet.  Neither the First Articles nor the production units, were available for inspection in this case.

It was an extreme miscarriage of justice which resulted in a fundamentally unfair hearing to permit Sixnet to even attempt to prove the design and production of its products in litigation that it commenced, after allowing Sixnet to destroy the design and production documents.  It was an extreme  travesty of justice, in light of unrefuted physical evidence that clearly showed not only the use of components of variable grades, manufacturer and even country of origins on the products, for the Arbitrator  to infer, based on nothing more than the rank, anecdotal testimony of a clearly interested witness, that Westcode was complicit in Sixnet's component substitution and variation. The Arbitrator in regards to Westcode's motions for  spoliation misapplied the law, failed to enforce Westcode's rights under the Arbitration Agreement, allowed the entire

---

excuse in such a situation to say that the components are compliant because the manufacturer said so.  When the lives and the health and the safety of passengers are involved on high speed rail cars, the parties in question have the right to expect more. They have the right, and in fact the contract provided, that documentation was to be provided.  It was not.

proceeding to be corrupted, and devastatingly prejudiced Westcode's rights.

Separate and apart from discovery sanctions is the evolving common law rule that a spoliator of key evidence is punished in some form usually involving the striking of its pleading. DiDomenico v. C&S Aeromatik Supplies, Inc., 252 A.D.2d 41, ____, 682 N.Y.S.2d 452, 459 (2d. Dept. 1998); and Yi Min Ren v. Professional Steam Cleaning, Inc., 271 A.D.2d 602, ___, 706 N.Y.S.2d 169-170 (2d. Dept. 2000).[6] The sanction applies even if the destruction occurred through negligence, as opposed to wilfulness, if the spoliator is on notice that the evidence might be needed for future litigation. DiDomenico, supra at ___, 682 N.Y.S.2d at 459.

> Spoliation sanctions...are not limited to cases where the evidence was destroyed wilfully or in bad faith, since a party's negligent loss is can be just as fatal to another party's ability to present [a case or] a defense.

Squitieri v. City of New York, 248 A.D.2d 201, ___, 669 N.Y.S.2d 589, ___ (1st Dept. 1998). As the Court in DiDomenico noted:

> Where...one party has destroyed critical...proof, such that it's opponents are "prejudicially bereft of appropriate means to [either present or] confront a claim with incisive evidence", the spoliator's pleading is properly stricken in order to obviate a trial that is based on a rank swearing contest.

---

6

Pennsylvania law is generally in accord with New York law on the issue of spoliation. See, Troup v. Tri County Confinement Systems, Inc., ___ Pa.Super. ___, ___, 708 A.2d 825, 828 (1998); and Cohen v. Chateau at Camelback, 37 Pa. D.&C.4th 317, 321 (Mon. 1997).

DiDomenico, supra at ___, 682 N.Y.S.2d at 459-460.

It is has been repeatedly held that the spoliation of an original document will prevent the spoliator from proving the contents of the destroyed document by secondary evidence.  People v. Betz, 272 A.d 737, ___, 74 N.Y.S.2d 791, 795 (1st Dept. 1947) (collecting cases).  The loss or destruction of key evidence before it can be examined by the opposing party warrants a dismissal, or at the very least the preclusion by that party from offering evidence as to what was destroyed.  See, Squitieri, supra at ___, 669 N.Y.S.2d 591.

None of the critical design or production documents were produced in this case despite clear and unequivocal notice that Sixnet was in breach of the Supply Agreements by reason of the non-compliant components as early as August 31, 1998, and despite Sixnet's own institution of litigation.  This case obviously turned out to be a "rank swearing contest".

It was Sixnet's burden to prove that its products satisfied the contractual temperature specifications.   See, Borman's, Inc. v. Olympic Mills, Inc., 1993 WL 1890344, p. 4 (S.D.N.Y.) (N.Y. law).  Sixnet admitted that it used components that were not properly rated.  Sixnet offered nothing more than anecdotal testimony that the rating notwithstanding, the components were compliant with contract temperature specifications because of some alleged undefined design phase qualification testing. Even if qualification testing were permitted, there are no documents from Sixnet which could ever identify, let alone prove, which non-compliant components, in which batches of shipped product, were allegedly tested.  Just as important, however, there was no way that Westcode could even explore the anecdotal testimony about the results of any

46

alleged qualification testing. Alleged qualification testing, if it occurred, is not an excuse to use substandard components. Assuming, <u>arguendo</u>, such testing could support the use of substandard componentry, there was no way Westcode could possibly have refuted bald anecdotal testimony that such testing actually occurred in this case. Westcode was prejudicially bereft of any way to confront Sixnet's arguments with incisive evidence.

In this case, the sanction of striking Sixnet's pleadings *i.e.*, dismissing its claims against Westcode was not only completely warranted, but it was required to insure fairness to the parties. First, without design and production records, Sixnet could not sustain its burden of proving that its subassemblies were contract compliant. Just as important, however, Sixnet had actual knowledge that its use of substandard componentry would play a prominent role in, and was key to, Westcode's claims and defenses. Sixnet refused to produce information relating to its decision to use such components during the term of the contract and, well after initiating this litigation, allegedly permitted such information to be destroyed knowing full well that it was key to Westcode's claims and defenses.

Westcode's prejudice was obviously substantial. The Arbitrator actually relied on the anecdotal testimony of interested witnesses (Mr. Schoenberg in particular) that the components had be qualified and that Westcode was complicit in their use on the First Article. Based on these "conclusions", the Arbitrator then found that the claim that the subassemblies were non-compliant was "false".

It was wrong of the Arbitrator to allow Sixnet to prove the design of complex electronic subassemblies with nothing more than anecdotal testimony from its President

that the subassemblies were contract compliant.  Despite admissions that commercially rated components were used in the subassemblies, no Sixnet witness could identify where they were used, when they were used, why they used or how many of them were used.  In addition, even if qualification testing was permitted, no Sixnet witness could identify whether or how the commercially rated components were qualified.  The Arbitrator should never have permitted Sixnet to sustain its burden to prove the design of its product without any incisive evidence regarding the design.  It was, however, a miscarriage of justice for the Arbitrator to have credited such self-serving testimony when, because of Sixnet's document destruction, Westcode was denied any meaningful evidence with which the self-serving anecdotal testimony of Sixnet could even be probed, let alone challenged.

In denying Westcode's spoliation motion, the Arbitrator allowed Sixnet to destroy the critical evidence in this case and to corrupt the proceeding.  The Arbitrator also ignored the law, denied Westcode any meaningful opportunity to present its defenses, exceeded his powers and/or so imperfectly executed his powers as to require that the Award be vacated.

3. **Assuming, <u>Arguendo</u>, that Sixnet's Delivery of Non-Conforming Products Did Not Entitle Westcode to Cancel the Purchase Orders, the Arbitrator Exceeded His Powers and/or So Imperfectly Executed Them, By Awarding Lost Profits and Interest**

   a. **Lost profits Were Not Permitted Under the Contract Documents Because of the Termination-For-Convenience Clause Contained in the Contract Documents**

Westcode was justified in canceling the Sixnet purchase orders in their entirety because of Sixnet's faulty performance and its breach of the contractual specifications. Under such a scenario, Sixnet is entitled to no damages. Even if one were to assume, however, for purposes of argument, that Sixnet's performance was exemplary, Westcode is obligated for no more than convenience type damages - *i.e.*, recovery of costs incurred for such things as unused, contract compliant, inventory. Sixnet was not, even if one assumes that Sixnet's performance was praise worthy, under any circumstances, entitled to allegedly lost future profits.

Because the Supply Agreements expressly incorporate the terms of the BART Conformed Contract, all of the provisions contained therein, including the termination-for-convenience clause, were part of the parties' contractual undertaking. Sixnet did not contest this point during the arbitration or in post-arbitration briefs. See, Sixnet's Reply to Westcode's Proposed Findings of Fact and Conclusions of Law, pp. 6-7.

The record in this case establishes that Adtranz would not have done business with Sixnet because of Sixnet's faulty performance and lack of cooperation. Pursuant

to the termination-for-convenience rights in the Adtranz contract, Adtranz took over the TCU and DDU portions of the Westcode purchase orders.

As of January 19, 1999, Westcode no longer had a need for TCUs and DDUs for the A and B car project. By virtue of its poor performance, lack of cooperation and the express incorporation of the prime contract into the TCU and DDU Supply Agreements, Sixnet is limited to termination-for-convenience-type damages which, in this case, would be for costs actually incurred for allegedly unuseable inventory.

In general, a termination-for-convenience clause permits one party to terminate a contract even in the absence of fault or a breach by the other party without suffering the consequences of a breach of contract. See, A.J. Temple Marble Co. v. Long Island Rail Road, 256 A.D.2d 526, 527, 682 N.Y.S.2d 422, 423 (2d Dept. 1998); Harris Corp. v. Giesting and Assoc., Inc., 297 F.3d 1270, 1272-1273 (11th Cir. 2002). Mr. Schoenberg, who admitted to having done a fair amount of government work, was very familiar with termination-for-convenience provisions. Termination-for-convenience-type terminations permit the terminated party to be compensated only for costs incurred plus a reasonable profit on work performed - but do not allow the recovery of anticipated profits. *E.g.*, Dart Advantage Warehousing, Inc. v. United States, 52 Fed.Cl. 694, 709

(Fed. Cl. 2002).[7]

It is universally recognized that a party to a contract, who has a right to cancel or terminate a contract may assert that right at any time even though it was not asserted at the time of the breach. *E.g.*, College Point Boat Corp. v. United States, 267 U.S. 12, 15-16 (1925); First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1013 (7th Cir. 1985); Ashcraft & Gerel v. Coady, 244 F.3d 948, 952 (D.C. Cir. 2001); A/S Dampskibbesettskabet v. U.S., 64 F.Supp.2d 298, 313 (S.D.N.Y. 1999); and Restatement (2d) of Contracts, § 385 comment (a) (1981). See also, Daniel E. Terreri & Sons, Inc. v. County Brd. of Comm., 152 Ohio App.3d 95, ___, 786 N.E.2d 921, 934 (2003).

A party who is sued for breach of such a contract may defend on the grounds that there existed, at the time of the alleged breach, a legal excuse for non performance even though he may have been unaware of that fact at the time. *E.g.*, College Point Boat

---

[7]

As noted by the Supreme Court in A.J. Temple Marble & Tile Co. v. Long Island Rail Road, 172 Misc.2d 422, 659 N.Y.S.2d 412, 414 (Queens Cty. 1997), *aff'd* in part by 256 A.D.2d 526, 682 N.Y.S.2d 422 (2d Dept. 1998), the authority on termination-for-convenience clauses has developed mainly in the Federal courts because the clauses are found mostly in government contracts. Thus, the Court in A.J. Temple Marble & Tile noted that courts should look primarily to Federal case law for guidance on that clause. New York law, in fact, is not contrary to the law that has developed in the Federal courts over the import of a termination-for-convenience clause.

Service, supra. In the context of a contract which contains a termination-for-convenience clause, the aforementioned principle of contract law is referred to as a "constructive termination-for-convenience". This principle allows an actual breach to be retroactively justified. *E.g.*, Linan Faye Construction Co., Inc. v. Housing Authority of the City of Camden, 49 F.3d 915, 923 (3d Cir. 1995).

The universally recognized effect of a termination-for-convenience clause in a contract is to moot all breaches of contract claims and to limit recoveries to costs. *E.g.*, Kalvar Corp. v. U.S., 543 F.2d 1298, 1304-1305 (Ct. Cl. 1976) cert. den. 434 U.S. 830 (1977). See also, Linan Faye, supra at 924; Inland Container, Inc. v. United States, 512 F.2d 1073, 1080 (Fd. Ct. Cl. 1975) (though contract breached, plaintiff not entitled to lost profits because contract contained a termination for convenience clause); and A.R. Sales Co., Inc. v. U.S., 49 Fed. Cl. 621, 630 (Fed. Cl. 2001) (well settled that presence of termination for convenience clause restricts damages recoverable for breach to damages which would have been allowed under termination for convenience clause had it been invoked). There is little question but that a deteriorating business relationship justifies a termination for convenience. Id. at 925-926.

The Adtranz/Westcode relationship and the Westcode/Sixnet relationship were both subject to discretionary terminations for convenience. There is no dispute that the Westcode/Sixnet relationship had deteriorated. Adtranz in fact terminated all three Westcode purchase orders - DDU, TCU and all. Westcode had the contractual right, even if Sixnet was not in breach, default or violation of the contracts, to terminate Sixnet.

Westcode was justified in canceling the Sixnet purchase orders in their entirety because of Sixnet's faulty performance and its breach of the contractual terms and

specifications. Under such a scenario, Sixnet was entitled to no damages. Even if one were to assume, however, for purposes of argument, that Sixnet's performance was exemplary, Westcode was obligated for no more than convenience type damages - *i.e.*, recovery of costs incurred for such things as unused, contract compliant, inventory. Sixnet was not, even if one assumes that Sixnet's performance was praise worthy, under any circumstances, entitled to allegedly lost future profits as the Arbitrator awarded.

The Arbitrator clearly applied remedies in this case that were not permitted. The Arbitrator completely disregarded, in fact ignored the termination-for-convenience clause which even Sixnet acknowledged to be part of the parties' Agreement. The effect of a termination-for-convenience clause in an agreement again, which was not disputed by Sixnet, is to preclude the recovery of lost profits in the event of a termination. Despite extensive briefing on the issue, the Arbitrator completely ignored it and awarded lost profits to Sixnet anyway. Not only did the Arbitrator fail to interpret the contract and fail to interpret and apply the law in regards to the termination-for-convenience clause, but since there was so much extensive briefing on the issue it can only be concluded that the Award of such a remedy was in manifest disregard of the law.

### b. The Arbitration Agreement Did Not Permit The Arbitrator to Award Interest In Lost Future Profits

The remaining portion of the Award consists of interest in the amount of $164,122.11. Quite clearly, ADR Rule, number 13,[8] which the Arbitration Agreement

---

[8]

In pertinent part, ADR Rule 13 provides:

required the Arbitrator to apply, restricted the Arbitrator's ability to award interest or delay damages. The Award, to the extent of the delay damages, is improper for that reason as well.

The ADR Options Rules which were incorporated by reference into the terms of the Arbitration Agreement, quite clearly prohibit the Arbitrator from issuing an award based on interest. In so doing in this case, the Arbitrator ignored his own rules and the rules of his arbitration body. Accordingly, in awarding the remedy of lost future profits, and interest on those profits, the Arbitrator exhibited a manifest disregard for the law, exceeded the powers given to him by virtue of the parties' Arbitration Agreement and/or so improperly executed the powers given to him as to warrant that the Award be vacated.

**4.      The Award is so Replete With Conclusions That Ignore The Record and The Law As To Show That The Arbitrator So Imperfectly Executed His Powers That The Award Should Be Vacated**

In addition to what is set forth above, there are other numerous errors in the Award. For one, the Arbitrator concluded that Adtranz terminated the BART suspension contract on the basis of Westcode's performance. (Arbitrator's Findings of Fact, ¶ 5(j)). In fact, that statement is not true. Kenneth Kelsey, the contract administrator for Adtranz, testified that the primary cause for Adtranz' termination of Westcode was Sixnet's performance. TR/Kelsey/pp. 12 & 22.

---

No monetary award shall be imposed for delay damages or interest, unless all parties agree, in advance and in writing, that the prevailing party would be entitled to such an award.

The Arbitrator placed great weight on the "Denial of Breach" provision in the August 21, 1998 Modification Agreement. The Arbitrator's conclusion there suffers from fatal legal and factual flaws.

Legally, of course, the denial of breach provision is not a release. Further, it is expressly stated in that provision that the agreement itself may not be utilized as evidence in any proceedings arising out of the BART project - which is exactly what the Arbitrator did.

Factually, however, the unrefuted record shows that the complaints about non-compliant components did not manifest themselves until after August 21, 1998. Mr. Zuber's initial report was not even circulated within Adtranz until August 13, 1998. Defendant's Exhibit 26. That report, of course, triggered additional investigations by Brandywine Management which were not presented until September 23, 1998. Defendant's Exhibit 27. That report was provided to Mr. Schoenberg on September 24, 1998, nearly one month after the execution of the Modification Agreement. Assuming, arguendo, that the denial of breach language was legally meaningful, it clearly can not be interpreted to have contemplated the issue which is at the heart of this case.

The Arbitrator also questioned the credibility of Westcode's complaints about the compliance of Sixnet's product by pointing to certificates of compliance that Westcode issued to Adtranz along with the product. (Arbitrator's Conclusions of Law ¶ 29). The Arbitrator suggested that this was proof of the Sixnet products' "complete compliance with all Westcode specifications and all the requirements contained in the relevant contract".

The Arbitrator completely overlooked, however, that the Sixnet product was so blatantly non-conforming that Westcode's customer, Adtranz, would not accept it.

55

TR/Kelsey/ pp. 14-15.  Rather, the unrefuted evidence established that Adtranz allowed the product to be delivered and installed in HVAC units under the condition that they would all ultimately be replaced.  Id.  The unrefuted record clearly establishes that the so-called certificates of compliance in fact were accompanied by rejection reports not only memorializing the conditional nature of the "acceptance" but also detailing, literally, 95 different reasons for rejection.  Defendant's Exhibit 76.

The Arbitrator concluded that Westcode's professed concern over the components that were being used in the Sixnet products was a subterfuge.  (Arbitrator's Conclusions of Law, ¶ 5(e)).  The Arbitrator based his conclusion on the supposed fact that, on October 13, 1998, the same day Westcode entered into an agreement with PCI, to manufacture the Sixnet products, Westcode demanded documentation "by Sixnet's vendors of their component parts for the Sixnet assemblies".  (Arbitrator's Findings of Fact, ¶ 51)  The Arbitrator argued that such a demand had never been made prior to that date, would have required Sixnet to research years (if not decades) of materials related to its products and might or might not have been able to satisfy as the information requested was "proprietary to Sixnet's vendors and not to Sixnet".  The unrefuted record is vastly different than the conclusions reached by the Arbitrator.

First, Defendant's Exhibit 27, a September 24, 1998 letter to Mr. Schoenberg from Richard J. Kelly, a Westcode Vice President makes clear that as of that date there was grave concern that "components on the boards...[did] not meet the requirements of the specifications".  The letter also reminds Mr. Schoenberg that a member of his staff had "verbally confirmed that the boards had changed from the approved First Article".

The September 24, 1998 letter enclosed in the Brandywine "interim report" on the

56

findings that existed as of that date regarding non-compliant components. The report is
extensive and in that letter Mr. Kelly advises Mr. Schoenberg:

> As you can see we are in a situation that we need to work
> through this problem as all Sixnet product is now under
> scrutiny. Without the proper documentation (per the Supply
> Agreement) including the rating data on the components, we
> cannot confirm and defend the design or the production units
> on both the TCU and DDU on any of the product delivered to
> date.
>
> You recognize that we want you to build more units, however
> as much as we need more units we will not pay for units that
> are not spec compliant and we will not accept more units that
> we cannot verify that the product is compliant.

In that same letter, which was three weeks before PCI was hired, and three weeks
before October 13, 1998, Mr. Kelly, on behalf of Westcode, then proposed that Mr.
Schoenberg forward the design data related to the hardware including the component
selection ratings. Mr. Kelly even offered to send people to Sixnet to assist in the process of
gathering that material.

Not only was the Arbitrator wrong in trying to correlate the timing of the request for
documentation with the date on which PCI was hired, the Arbitrator was also wrong to even
question the **bona fides** of the request for documentation. The interim report, which was
sent to Mr. Schoenberg on September 24, 1998, itself proposed the collection of the design
data in order to determine the compliance of all of the components used on the Sixnet
product. Westcode clearly did not create a demand for design data as a subterfuge.

Westcode was in hot water with its customer, Adtranz, primarily over Sixnet's
performance. All of Sixnet's product was under scrutiny. Sixnet had admitted that its
production units had deviated from the First Article designs. Westcode was told by

Brandywine to gather design documents from Sixnet in order to verify the products. In an effort to accommodate its customer, ADtranz, and to work with Sixnet, Westcode made the appropriate document requests. The unrefuted evidence in the record showed that there was nothing improper about Westcode's conduct in that regard.

Many of the facts upon which the Arbitrator relied were mistaken. Several of those facts were critical to the reasoning that the Arbitrator used in finding that the components were compliant. Without those facts, the Arbitrator's support for the Award crumbles or is nonexistent. In addition, however, even as to non-critical facts, the mere number of factual errors made by this Arbitrator establishes a near complete misapprehension of, or even disregard for, the record.

There is no excuse for the number of factual errors made by the Arbitrator that could possibly sustain the Award. All of the facts as they related to the Arbitrator's findings were not only contained in a detailed and volumunous record that was transcribed and sent to the Arbitrator at the parties' expense but they were also contained and highlighted for the Arbitrator's benefit in detailed, proposed findings of fact, proposed conclusions of law, and other post-arbitration briefs. Other than a manifest disregard for the record, there is no excuse for having gotten so many facts wrong, and for having gotten facts so critical to the reasoning supporting his decision, wrong.

The Arbitrator was obligated to proceed in this matter like a judge in a non-jury trial. The Arbitrator was, therefore, obligated to base his decision on the record and the applicable law. The Arbitrator not only did not base his decision on the law and the record, but his decision exhibits a manifest disregard of the record and the law. For that reason the Award must be vacated.

## IV.    CONCLUSION

For the reasons stated more fully above, the Plaintiff, Westcode, Inc., respectfully requests that the July 13, 2003 Award from ADR Options, Inc. be vacated in its entirety.


Respectfully submitted,

**PHILLIPS & CAMPBELL, P.C.**

_____
Patrick C. Campbell, Jr.
ID No. 53350
314 N. Middletown Road
Lima, PA  19037
610/548-7100
Attorneys for Plaintiff

**Dated**:        September 5, 2003