## I.      INTRODUCTION

In this case, Westcode, Inc. ("Westcode") retained the services of Digitronics Inventioneering Corp. ("Sixnet") to supply electronic monitoring devices for a rail car refurbishing project for the San Francisco Bay Area Rapid Transit Authority ("BART").  The products that were supplied did not conform to the contractual design specifications in that they contained components that were not rated to perform to the contractual temperature specifications.  Accordingly, Sixnet was replaced.  While pursuing this claim for damages for wrongful termination, Sixnet actually destroyed the design and production documents related to its use of non-compliant components.  Notwithstanding the unrefuted evidence in the record regarding the component substitution, and the fact that all of the component substitution records had been destroyed, the Arbitrator not only permitted Sixnet to present its claims but put Westcode in the unwinnable position of having to prove the flaws in

Sixnet's designs and/or production without the critical, incisive, design and production records. To make matters worse, the Arbitrator actually, based on nothing more than anecdotal testimony by interested witnesses, ruled that Sixnet did not breach the parties' contracts and awarded Sixnet $1,075,911.60. Westcode submits this statement of undisputed facts in connection with its motion to vacate and/or modify that award.

## II.   BACKGROUND

1.      Westcode, is a Pennsylvania corporation with a facility located at 1372 Enterprise Drive, West Chester, Pennsylvania, 19380. Westcode has been in the business of manufacturing, supplying, assembling, installing and/or renovating component systems for use in rail cars throughout the United States and abroad for over 30 years. Arbitrator's Findings of Fact and Conclusions of Law, ¶ 3 ("AFF ¶ ___" or "ACL ¶ ___") which is attached as part of the undisputed record as Exhibit "A".

2.      Sixnet is a Delaware corporation with an office located at Northway 10 Professional Park, P.O. Box 767, Clifton Park, N.Y. 12065. Sixnet is in the business of manufacturing industrial electronics for monitoring and control. The Arbitration hearing Transcripts, p. 39 ("TR/H/p.___") which are attached as part of the undisputed record as Exhibit "B".

3.      In or about March, 1995, Daimler Chrysler Rail Systems (North America), Inc. ("Adtranz") entered into a contract with BART to refurbish and rehabilitate 200 of BART's model "A" and "B" rail cars ("the BART project"). BART also had an option to have Adtranz refurbish and rehabilitate 239 rail cars after the first 200 rail cars were completed for a total of 439 rail cars. AFF ¶ 5.

4.      The BART project required, among other things, that the refurbished rail cars

2

have new heating, ventilation and air conditioning ("HVAC") systems installed, new suspension/pneumatic systems installed, and the existing door operator systems overhauled.  AFF ¶ 5.

5.      In or about January 1996, Adtranz tendered purchase order number TXS404067 to Westcode for the design and manufacture and installation of 439 car sets of HVAC systems which Westcode accepted in or about December, 1995.  The purchase order incorporated certain terms and conditions referred to as The San Francisco Bay Area Rapid Transit District Rehabilitation of Transit Vehicles Agreement Between AEG Transportation Systems, Inc. and Westcode, Inc., Agreement No. TXS404067 ("the BART Agreement").  See, Defendant's Exhibit 17[1] which is attached as part of the undisputed record as Exhibit "C".

6.      Subsequently, on or about February 1, 1996 and June 25, 1996, Adtranz submitted purchase orders to Westcode, respectively, for the design, manufacture and/or overhaul of the suspension systems and the door operator systems.  Westcode ultimately accepted the above-mentioned purchase orders for the suspension project and the door overhaul project.  Westcode was thus the supplier for the suspension system, the HVAC system and the door operator system.

7.      The HVAC systems were to include a temperature control unit ("TCU").  The purpose of the TCU was to monitor and control the performance of the HVAC system.  AFF ¶ 7.

---

[1]      References to "Defendant's Exhibit" or "Plaintiff's Exhibit" refer to the exhibits as identified and accepted into evidence during the underlying Arbitration proceeding.

8.     The door systems were required to include a door diagnostic unit (DDU"). The DDU was to monitor (but not control) the door operating system.  Both the TCUs and DDUs required customized software as well as hardware.  AFF ¶ 8.

9.     The TCU and DDU subassemblies consisted of numerous boards with various electronic componentry.  A photograph of an unenclosed TCU, with components, is attached as part of the undisputed record as Exhibit "D".  A photograph of an individual board, with components, is attached as part of the undisputed record as Exhibit "E".

**A.     The Terms of the Contract Documents That Are, or Should Have Been, At Issue in This Case**

10.     Sixnet was selected as Westcode's sub-supplier for the DDUs and TCUs.  On or about January 18, 1996, Westcode and Sixnet entered into an agreement titled Temperature Control Unit Supply Agreement ("TCU Supply Agreement") and an agreement titled Door Diagnostic Unit Supply Agreement ("DDU Supply Agreement").   Plaintiff's Exhibits 6 & 7 which are attached as part of the undisputed record as Exhibits "F" and "G".

11.     Westcode's actual purchase order number P-40165 was issued for the TCUs on or about March 22, 1996.  Similarly, Westcode's purchase order number P-40616 was issued for the DDUs on or about the same date.  Defendants Exhibits 40 which are attached as part of the undisputed record as Exhibits "H" and "I".

12.     With the exception of technical requirements and specifications for the products, the two Supply Agreements are nearly identical.  The provisions of the two agreements that are pertinent to this matter will be discussed in more detail below.

13.     Sixnet was also a Westcode sub-supplier on two other totally unrelated jobs. One job was for the South Eastern Pennsylvania Transportation Authority ("the SEPTA

4

project"). Adtranz, coincidentally, was the general contractor on the SEPTA project. The other job was a separate job for BART ("the BART C-2 car job"). *E.g.*, TR/H/p. 58. Both jobs were for versions of the DDU. Neither job involved TCUs.

14. The SEPTA purchase order, which is identical to the BART purchase orders as far as the terms and conditions on the backside are concerned, was issued to Sixnet, and accepted by Sixnet, prior to the issuance of the purchase orders in this case. TR/H/pp. 48, 258-259 & 265.

### i.   The Contract "Flow Through" Provisions

15. First and foremost, Article 2.10 of both the TCU Supply Agreement and the DDU Supply Agreement is what is generally known as a "flow through" provision in that it incorporated, by express reference, various prime contract documents, among others, and listed those documents in order of their priority to the contract. Specifically, Article 2.10 of the TCU Supply Agreement expressly incorporated Westcode specification W1185-ER-011, and the entire BART contract document.

16. Sharon Gutman from Sixnet signed the Supply Agreements on Sixnet's behalf.

17. Article 19 of the terms and conditions on the backside of the Westcode purchase orders (which expressly take precedence over the Supply Agreements) provides that Pennsylvania law applies to the entire order. Defendant's Exhibit 40.

### ii.   The Contract Temperature Specifications

18. In keeping with the flow through of, and the order of precedence of, the various contract documents, the sources for the product specifications were numerous.

First, the purchase order, Article 1.b provided as follows (emphasis added):

> By acceptance of this order, seller agrees to be bound by, and to comply with, all of the terms and conditions of this order including any amendments thereto **and all specifications and other documents referred to in this order**... .

19.     Article 1.1 of the TCU Supply Agreement, as to the design of the TCU hardware, provided that the functionality of the TCU hardware would conform to Westcode's specification from W1185-ER-011 Issue I and application documents.  The TCU specification W1185-ER-011 (as well as the TCU Supply Agreements) incorporates the BART Conformed Contract Book and AEG Procurement Specification RTPS-BABA T6015, Rev B, 7 July 1995.  The contract specifications provide that the temperature range of both the performance of the vehicle and its subsystems (including the DDU and TCU) was to be 20°F to 120°F.  AEG Procurement Specification RTPS-BABA T6015, Rev B, 7 July 1995, a copy of which is attached to the undisputed as Exhibit "J"; see also BART Conformed Contract Book No. 41-MF-110A, Article T1.10.D.1; and W1110-ER-024, Article I.B.1. (DDU), a copy of which is attached to the undisputed as Exhibit "K".

20.     Sixnet admits that aforementioned temperature specifications were never modified.  TR/H/pp. 243 & 245.

### iii.     The Contractual Component Selection Criteria

21.     Electronic componentry comes with manufacturer ratings or specifications which, among other things, guarantee that a component will perform under certain specified conditions such as temperature extremes.

22.     What is known generally as the "commercial rating" is 32°F  to 158 ° F. TR/H/p. 612.

6

23.     What is known generally as the "industrial rating" is -40°F to 185°F.  TR/H/p. 612.

24.     The fact that a component is guaranteed by the manufacturer to perform at one set of temperature extremes does not mean that it is not possible that it will perform under more severe conditions - it is not, however, guaranteed by the manufacturer to perform under those temperature extremes.  TR/H/p. 620.

25.     Under some circumstances a component may be qualified for use at a temperature range beyond its manufacturer specifications by some sort of qualification testing.  TR/H/p. 691.

26.     It is important to note at this point that the contracts in this case, however, prohibited the use of electrical components not properly rated, in the first instance, by the manufacturer, and prohibited sub-suppliers from using inferior componentry under the guise of qualification selection or screening.  TR/H/p. 609.

27.     In other words, screening and qualification testing to qualify the use of substandard components was not permitted under the BART Conformed Contract. TR/H/p. 692.

28.     In particular, the BART Conformed Contract provided the following regarding the required performance specifications of the electronic components (emphasis added):

> 2.      Electrical, electronic and electromechanical parts selection: Selection for parts for contract hardware shall be made on basis of suitability for their applications, proven ability to comply with requirements of the Contract Documents and availability from at least two Suppliers.   Additionally, like parts shall be interchangeable **without selection or screening**.

BART Conformed Contract, Article T.17.1.B.2.  Defendant's Exhibit 17.

29.     Not only was screening and qualification testing expressly prohibited, but Sixnet even admitted that the contract expressly required that components in the products be rated, in the first instance, on the basis of their respective manufacturer data sheets, to perform to the contract temperature specifications.  See, the BART Contract, Article 17.9.A.1.a; and TR/H/pp. 155 & 376 (Schoenberg); see also, TR/H/p. 609.

30.     In that regard, the contract provided as follows:

**17.9   ELECTRICAL MATERIALS**

A.      Electrical, Electronic, and Electromechanical Parts Requirements

1.      Specifications

a.      Each electrical, electronic and electromechanical part shall be selected and controlled on the basis of manufacturers data sheets, catalog cuts, or control drawings that identify the parts physical, environmental, and performance requirements as well as quality and reliability requirements, including inspections and tests for qualification and acceptance, and lot sampling where required.

31.     In Article 2.5 of the Supply Agreements, Sixnet expressly warranted that the product would be free from defects in both material and workmanship.  Plaintiff's Exhibits 6 & 7.

**iv.     The Contract Termination Provisions**

32.     The BART conformed contract contained detailed termination provisions.

8

Those provisions, by virtue of the flow through provision, are expressly incorporated by reference, into the TCU and DDU Supply Agreements.

33.    The contract contained a typical default termination provision which made both the failure to supply products according to schedule and the supply of products, improper quality, defaults under the contract.

34.    Just as important, however, was a termination-for-convenience clause which gave the buyer the right to terminate any or all of the subcontracts when it was determined by the buyer to be in the buyer's best interest.  The termination-for-convenience provision was as followed:

**P8.07 CONTRACT TERMINATION**

> B.    Termination for the Convenience of the District. The performance of the Work under the Contract may be terminated in whole or in part by the District upon written notice to the Supplier in accordance with this Article P8.07B, whenever the District determines that such termination is in its best interest.  After receipt of said notice, the Supplier shall submit to the Project Director its termination claim, which claim shall be submitted in accordance with the claims provision of Article P9.05A, entitled "Potential Claims", and the payment provisions in Article P9.05B, entitled "Final Payment and Claims".

BART Conformed Contract, Article P.8.07(B).  Defendant's Exhibit 17.

35.    Sixnet did not refute the fact that, by virtue of the "flow through" provision in the Supply Agreements, the aforementioned termination provisions were applicable to Sixnet as the sub-supplier.  See, generally, Sixnet's Reply to Westcode' Proposed Findings of Fact and Conclusions of Law, pp. 6-7 which is attached to the undisputed record are Exhibit "L".

9

**B.     Sixnet's Faulty Performance**

    **i.     Sixnet's Products Did Not Conform to the Contractual Temperature Specifications**

36.     The TCUs, the DDUs suffered from critical component specification and functionality problems.

37.     As set forth above, among the pertinent contract specifications were the following:

-     To perform in temperature extremes of 20°F to 120°F;

-     To contain component parts that were guaranteed, without qualification screening or testing, to perform at the contractually specified temperature extremes.

38.     Nearly 25% of the TCUs supplied by Sixnet failed contract burn-in testing. Defendant's Exhibit 93 which is attached as part of the undisputed record as Exhibit "M".

39.     The high burn-in failure rate naturally led to a closer examination of the TCUs themselves.  This examination revealed that Sixnet was using electronic component parts that were not properly rated by the manufacturers to perform at the required temperature extremes.  In other words, the inspection revealed that Sixnet was using components with a commercial rating.

40.     The issue of the use of non-compliant components first surfaced in or around August, 1998 when Pierre Zuber was sent in by Adtranz to help determine the cause of the high burn-in failures.  In his August 13, 1998 memorandum, Mr. Zuber noted the presence of non-conforming components in the TCUs and DDUs.  Defendant's Exhibit 26 which is attached as part of the undisputed record as Exhibit "N".

41.     Mr. Zuber's findings, of course, led to Westcode's first written request, on

August 31, 1998, for back-up materials certifying Mr. Schoenberg's previous representation that his component manufacturers all "guaranteed the temperature range on the components". Defendant's Exhibit 43 which is attached as part of the undisputed record as Exhibit "O".

42.     Brandywine Management, an independent consulting firm, was then brought in to investigate the problem. In Brandywine's September 23, 1998 Interim Hardware Engineering Report, Brandywine also noted that the TCUs and DDUs utilized components not rated by their respective manufacturers to perform within the required temperature ranges. Brandywine's suggestion was that Westcode should (1) identify the non-compliant components; and (2) produce manufacturing ratings for those components; or (3) replace these components. Plaintiff's Exhibit 26 which is attached as part of the undisputed record as Exhibit "P".

43.     It was based on the Brandywine Report, that Westcode, by letter dated September 24, 1998, advised Sixnet:

> As you can see we are in a situation that we need to work through this problem, as all SIXNET product is now under scrutiny. Without the proper documentation (per the supply agreements) including the rating data on the components, we cannot confirm and defend the design of the production units on both the TCU and DDU on any of the product delivered to date.
>
> You recognize that we want you to build more units, however, as much as we need more units we will not pay for units that are no spec compliant and we will not accept more units that we cannot verify that the product is compliant.

Plaintiff's Exhibit 26 (emphasis added).

44.     The September 24th letter also confirmed an incriminating conversation that

Mr. Kelly had with a Sixnet engineer wherein the engineer advised Mr. Kelly that Sixnet had in fact supplied boards that deviated from approved designs.  Id.

45.     Having been told by Sixnet engineers that the boards had changed from the First Article, and having found through two separate, independent inspections, non-compliant components, Westcode, at the suggestion of Brandywine, asked to review the design data on the components.  Plaintiff's Exhibit 26.

46.     In his September 24, 1998 response, Sixnet's President, Steve Schoenberg did not deny that Sixnet had been substituting components.  Rather, Mr. Schoenberg's response was that the substitution was not "intentional".  Plaintiff's Exhibit 27 which is attached as part of the undisputed record as Exhibit "Q".  Mr. Schoenberg refused, however, for reasons he later described as"business", to the produce records relating to the component ratings.

47.     Mr. Schoenberg's response to Mr. Kelly's September 24th request for the design documentation was summarized in writing by Dennis Page as follows (emphasis added):

> As to producing paperwork to show that all commercial grade components are in compliance with the temperature range required by our specifications, Mr. Schoenberg said he "declines to play".  He stated that to show that all components are within tolerance would require "a station wagon full of paper" and refused to comply.  **I informed him that we will have to produce such evidence for Adtranz.  Steve then made a crude suggestion about where we should tell Adtranz to go**.

Defendant's Exhibit 71 which is attached as part of the undisputed record as Exhibit "R".

48.     One of Sixnet's former engineers, Gary Lewis, admitted that the Sixnet TCUs

and DDUs incorporated components with manufacturer specifications that did not meet the contract specifications for temperature extremes.  Gary Lewis Trial Deposition Transcript pp. 14-19 ("TR/Lewis/p. 16 "), a copy of which is attached as part of the undisputed record as Exhibit "S".  Sixnet's President, Steve Schoenberg, admitted the same.  TR/H/278.

49.    Sixnet's admissions aside, Westcode also found numerous commercially rated components in the design.  *E.g.*, TR/H/pp. 613-626.

50.    Adtranz was well aware of the fact that the component parts on Sixnet's products were non-conforming.   Adtranz, of course, held its supplier, Westcode, accountable.   The unrefuted evidence in this case was that Adtranz, the prime contractor, would not, under any circumstances, issue a final acceptance for Sixnet's TCUs or DDUs with the non-compliant commercial grade componentry.   Trial Deposition of Kenneth Kelsey, the Adtranz Contract Administrator, pp. 14-15 (" TR/Kelsey/pp.___"), a copy of which is attached as part of the undisputed record as Exhibit "T".

51.    Westcode was not an end user of Sixnet's defective products.  In order to keep production moving, the products were obviously turned over to the customer, Adtranz.  TR/Kelsey/pp.13-14,

52.    Hence, because they were non-conforming, the products shipped to Westcode were only conditionally accepted (the condition being that they would be replaced) by Adtranz in order to keep the production moving.  TR/Kelsey/p. 14.

53.    The DDUs share the same fundamental problems as experienced by the TCUs.  The DDUs were failing the burn-in test at a high rate.  The DDUs also contained substandard, non-compliant componentry.  See, generally, TR/H/p.613.

ii.     **Sixnet Unilaterally Ceased Deliveries After Delivering Product that was Late and Non-Conforming**

54.     On July 30, 1998, Adtranz sent Westcode a notice of intent to terminate the Westcode/Adtranz purchase orders for default.  Sixnet's faulty performance was the primary cause for the action taken by Adtranz.  Defendant's Exhibit 25, which is attached as part of the undisputed record as Exhibit "U"; and TR/Kelsey/p. 12.

55.     Westcode immediately forwarded the Adtranz default letter to Sixnet and clearly and unequivocally put Sixnet on notice of the critical need to cooperate and the consequences if cooperation was not forthcoming.  In particular Westcode advised Sixnet:

> Our objective, whether the demands are reasonable or not, has to be to comply with the demands of our customer [Adtranz].  When you are able to call me back I wish to find a way to accomplish this objective without totally disrupting your business, but also without jeopardizing mine.  I wish to state that I have no desire to sever our relationship, but we must do what is necessary to protect Westcode's business.

Defendant's Exhibit 54 which is attached as part of the undisputed record as Exhibit "V".

56.     By August 21, 1998, Westcode was taking concrete steps to begin to address the alleged defaults under the Adtranz contract caused by Sixnet.  Particularly, Westcode took over the software portion of the DDU and TCU supply agreements.

57.     The takeover was accomplished by virtue of the August 21, 1998 Modification Agreements and Conditional Release entered into by Sixnet and Westcode.  Plaintiff's Exhibit 24, a copy of which is attached as part of the undisputed record as Exhibit "W".

58.     While the software portions of the contracts were transferred to a new

14

vendor, as the Zuber report shows, problems with the components used on the hardware were surfacing.

59.     While Westcode desired that the hardware portions of Sixnet's contracts be fulfilled by Sixnet, it had no choice in light of Sixnet's performance but to explore replacement suppliers.  See, generally, Defendant's Exhibit 54 and Plaintiff's Exhibit 26.

60.     Sixnet made Westcode's decision to procure a substitute supplier for hardware easy when, in September, 1998, Sixnet unilaterally refused to ship any more products.  Defendant's Exhibit 38 which is attached as part of the undisputed record as Exhibit "X".

61.     As previously mentioned, during the time periods relevant to the parties' dispute in this case, Westcode and Sixnet were parties to contracts relating not only to the BART TCU and DDU projects, but they were also party to separate unrelated DDU supply contracts for another BART vehicle model and the SEPTA job.

62.     On September 11, 1998, Sixnet delivered 25 TCUs to Westcode.  The invoice for those deliveries was for $74,346.27.  See, Defendant's Exhibit 39, which is attached as part of the undisputed record as Exhibit "Y"; and Defendant's Exhibit 51 which is attached as part of the undisputed record as Exhibit "Z".

63.     One week later, on September 18, 1998, after already breaching its delivery obligations and delivering non-conforming product, almost exclusively because of outstanding balances on the unrelated BART job and the SEPTA job, Sixnet advised Westcode that it was stopping production and it would make no further deliveries of any products, on any jobs, including TCUs and DDUs, until it was paid in full.  Defendant's Exhibit 38.

64.     If one takes out boards that were delivered on September 11, 1998, all that was due and actually owing as of September 11, 1998 for TCUs was approximately $500.00.  TR/H/pp. 323 & 515.

**C.     Sixnet Was Replaced as the Hardware Supplier for TCUs and DDUs**

65.     Sixnet was paid in full for all of its Westcode accounts on October 31, 1998. TR/H/p. 322.  By that time, however, Westcode had no choice but to find a substitute supplier for the hardware portions of the TCU and DDU supply contracts.

66.     No further product at that point was ever shipped by Sixnet for the BART "A" and "B" car jobs.  TR/H/p. 202.  The other two Westcode/Sixnet jobs continued.

67.     On October 13, 1998, Westcode retained PCI to complete the DDU and TCU hardware.  TR/H/p. 732.

68.     Using the same specifications that were supplied to Sixnet, PCI was able to produce product for the BART A and B car job that conformed to contract specifications. TR/Kelsey/pp. 17-18.

69.     Eventually, all of the BART A and B car, and SEPTA, Sixnet products had to be scrapped and replaced.  TR/Kelsey/p. 15; and Trial Deposition Transcript of John Scanlon, Adtranz' Supervisor for the SEPTA job, pp. 18-19 ("TR/Scanlon/pp. ___") which is attached as part of the undisputed record as Exhibit "AA".

**D.     Adtranz Eventually Removed TCUs and DDUs from Westcode's Sub-Supply Agreements and then Terminated Westcode Altogether Because of Sixnet**

70.     On December 9, 1998 Adtranz notified Westcode that it was actually taking over the DDU/TCU hardware portions of its contract with Westcode.  Adtranz actually took

16

over the hardware portions of the DDU and TCU supply agreements by letter agreement dated January 19, 1999.   Defendant's Exhibit 61 which is attached as part of the undisputed record as Exhibit "BB".

71.   That January 19, 1999 Agreement completely ended any involvement Westcode had in the supply of DDUs and TCUs for the BART A and B car rehabilitation project.  See, Defendant's Exhibit 61; see also TR/Kelsey/p. 17.

72.   From October 1998 until April 1999, Sixnet had no communications with anyone from Westcode about delivering any more BART TCUs or DDUs.  TR/H/p. 201.

73.   Sixnet's performance created discord and strife between Adtranz and Westcode that turned out to be irreparable.  See, Deposition of Harry Kolesar, p. 186 ("TR/Kolesar/p. ___") a copy of which is attached as part of the undisputed record as Exhibit "CC".

74.   Adtranz eventually terminated all three Westcode purchase orders in full on or about May 19, 1999.  TR/Kelsey/p. 22.

75.   While there were a number of issues between Adtranz and Westcode regarding the HVAC units, the decision to terminate Westcode for all three of its purchase orders, including the suspension purchase order for which there were no Westcode performance issues at all, was motivated primarily by the problems created by Sixnet's performance.  TR/Kelsey/pp. 12 & 22.

76.   The termination resulted in litigation styled, <u>Daimler Chrysler Rail Systems, Inc. v. Westcode, Inc.</u>, C.C.P. Allegheny County, G.D. No. 00-1552 and <u>Daimler Chrysler Rail Systems, Inc. v. Westcode, Inc.</u>, U.S.D.C. E.D. Pa. No. 00-cv-4928.

77.   The above-mentioned Westcode/Adtranz litigation settled with $550,000.00

paid to Westcode and an exchange of releases.  TR/H/p. 742.  Sixnet, of course, refused several Westcode invitations to defend its performance and its products in the litigation with Adtranz.  See, TR/H/p. 745.

       **E.**    **The Procedural Background of the Westcode/Sixnet Litigation**

78.    Sixnet commenced the action styled, <u>Digitronics Inventioneering Corp. v. Westcode, Inc.</u>, State of New York, Supreme Court - Appellate Division, Index No. 99-1395 on June 14, 1999.

79.    By agreement of the parties, the claims were submitted to arbitration by ADR Options, Inc. A true and correct copy of the parties' Arbitration Agreement and Stipulation is  attached as part of the undisputed record as Exhibit "DD".

80.    ADR Options, Inc. is located at Two Commerce Square, Suite 1100, 2001 Market Street, Philadelphia, PA 19103.

81.    The Arbitration was conducted from December 2-4, 2002.

82.    After extensive post-hearing briefing which included, among other things, the submissions of detailed proposed findings of fact and conclusions of law, by Award issued July 15, 2003, in Philadelphia, Pennsylvania, the Arbitrator found in favor of Sixnet in the amount of $1,075,911.60 for lost profit and interest.  A true and correct copy of the July 15, 2003 Award is attached as part of the undisputed record as Exhibit "EE"; copies of Westcode's post-hearing briefs are attached to the record as follows: December 31, 2002, January 7, 2003 and February 3, 2003 letter from Westcode's counsel to Arbitrator Rutter of the undisputed record as Exhibits "FF", "GG" and "HH", respectively.  Also attached is Westcode, Inc.'s Proposed Findings of Fact which is attached as part of the undisputed record as Exhibit "II"; Westcode, Inc.'s Proposed Conclusions of Law which is attached as

18

part of the undisputed record as Exhibit "JJ"; and Westcode, Inc.'s Consolidated Reply to Digitronics Inventioneering Corp.'s Proposed Conclusions of Law and Findings of Fact and Digitronics Inventioneering Corp.'s January 15, 2003 Letter which is attached as part of the undisputed record as Exhibit "KK".

> **F.     The Unrefuted Evidence of Non-Conforming Components Produced at the Arbitration Hearing**

83.     All of the product manufactured by Sixnet and delivered to Westcode were ultimately delivered to and then scrapped by Adtranz.  There were not, therefore, delivered items available for inspection in this litigation.  See, TR/H/p. 2914 (Schoenberg).  There were, however, a few remaining boards in Sixnet's inventory.  Consistent with Sixnet's admissions, the review of remaining product disclosed unrefuted evidence at the hearing of the substitution of commercial grade components.

84.     First, Mr. Lewis testified that components were used on the products that were not rated by their respective manufacturers to perform within the contract temperature range of 20° F to 120° F.  Mr. Lewis could not recall just how many components of that type were used on BART TCUs and DDUs or why they were used.  TR/Lewis/pp. 14-19.

85.     Inspection of the remaining boards showed not only substandard component temperature ratings, but some components were from different manufacturers and, for that matter, some were even from different countries.  See, TR/H/pp. 613-615.

86.     Inspection also revealed 11 out of 15 integrated circuits on one set TCU boards were commercial as opposed to industrial.  See, TR/H/p. 614.

87.     By way of further example, inspection also revealed that out of 13 identical DDU boards, 7 U4 components were industrial and 6 were commercial).  See, TR/H/p.616.

88.     Sixnet's decision to use at least commercially rated Motorola semiconductors, as opposed to the industrially rated Motorola semiconductors was based purely on the fact that the commercially rated component was cheaper.  See, TR/H/pp. 380-382; see Defendant's Exhibit 109 which is referenced as Exhibit "LL" as part of the undisputed record.

89.     Inspection also revealed that some of the components found in the only assembled TCU produced at the hearing by Sixnet did not match counterpart components found in identical unassembled boards that remained in Sixnet's inventory.  There was, therefore, not only a use of substandard commercial grade components, but there was also a variation among the different boards.  TR/H/pp. 624-625.

### G.     Sixnet's Destruction of Design and Production Records

90.     Sixnet, at all times, refused to produce any documentation regarding the manufacturers' alleged certifications that components were properly rated.  In fact, when Westcode representatives impressed upon Mr. Schoenberg that Westcode was required to produce specification documentation to Adtranz, as mentioned above, Mr. Schoenberg made a crude suggestion about where Adtranz could go.

91.     The claims and counterclaims in this case center around Sixnet's performance under TCU and DDU Supply Agreements dated January 18, 1996.

92.     At the forefront of Sixnet's performance, was the delivery of non-conforming products.  Sixnet's President, Steve Schoenberg, and one of its former engineers, Gary Lewis, both admitted during their depositions that the Sixnet TCUs and DDUs incorporated components with manufacturer specifications that did not meet the contract specifications for temperature extremes.  TR/Schoenberg, Vol. II/p. 5; and TR/Lewis/pp. 14-19.  A copy of

the Trial deposition transcripts of Steve Schoenberg are attached as part of the undisputed record as Exhibit "MM".

93.     According to Sixnet engineer, Gary Lewis, the decision to use components in the TCUs and DDUs with substandard manufacturing specifications was based on, and allegedly supported by, qualification testing that (Mr. Schoenberg admitted was prohibited but that) allegedly occurred during the design phase of the product.  Mr. Lewis contended that such testing proved the suitability of the substandard components to perform at the contract temperature range notwithstanding the manufacturer's specifications. TR/Lewis/pp. 14-19.  Neither Mr. Lewis nor Mr. Schoenberg could identify exactly what the testing consisted of or how many components had been pre-tested.  TR/Lewis/pp. 14-19; TR/Schoenberg/pp. 5-6.

94.     At his deposition, Mr. Schoenberg stated that a document identified as an "issue listing" would identify the components that were used in the different batches of product shipped to Westcode.  TR/Schoenberg/Vol. I/pp. 51-52.

95.     Mr. Schoenberg also testified that the testing that would have been done to allegedly qualify the substandard componentry would have been documented in design notes.  TR/Schoenberg, Vol. II/ p. 9.

96.     By letters dated July 2, 2002 and September 3, 2002 from counsel for Westcode to counsel for Sixnet, the above-mentioned documents, as well as any other documents which could assist in identifying the components used in the products shipped as well as Sixnet's alleged engineering analysis which allegedly supported the decision to use substandard components, be produced.  True and correct copies of the July 2, 2002 and September 3, 2002  letters are attached to the undisputed record as Exhibits "NN" and

21

"OO", respectively.

97.    On or about August 12, 2002, Sixnet advised Westcode that all design, test and production records had been destroyed.  See, generally, the August 12, 2002 letter from counsel for Sixnet  which is attached as part of the undisputed record as Exhibit "PP".

98.    The delivered products were gone.  They were conditionally released to Westcode's customer Adtranz despite substantial non-conformities so that the production line could keep moving.  TR/Kelsey/pp. 13-14.  The only proof of what components actually went into those products would have been the issue listing.

99.    Sixnet commenced this litigation by filing a complaint in the action styled, Digitronics Inventioneering Corp. v. Westcode, Inc., Supreme Court of New York, Saratoga County, Index No. 99-1395, on June 14, 1999 and therefore was obliged to preserve evidence relating to its performance under the contract.

100.    Further, litigation aside, Article T16.8.A of the BART Conformed Contract, again, which was incorporated into the Sixnet Supply Agreement, required sub-suppliers to maintain records required to provide evidence of the quality of its sub-systems.  See, BART Contact, Article T16.8.A.

101.    Despite repeated contract requests for information certifying the quality of the components in Sixnet's products, despite having a contractual obligation to maintain and provide such documentation, and despite itself having commenced this litigation knowing full-well that the quality of the components would be a major issue in the case, Sixnet destroyed the only documents which would provide incisive insight into how many components in each batch of products were sub-standard, which components in each batch of product were substandard and what testing was allegedly done to qualify those

22

substandard components for use and in the products.

102.     On November 1, 2002, Westcode filed a motion seeking relief because of Sixnet's spoliation of critical design and manufacturing evidence.  A true and correct copy of the November 1, 2002 Motion is attached as part of the undisputed record as Exhibit "QQ".

103.     By Order dated November 27, 2002, the Arbitrator ruled that the motion was denied without prejudice pending proof that the spoliation of the design records harmed Westcode.  A true and correct copy of the November 27, 2002 Order is attached as part of the undisputed record as Exhibit "RR".

104.     As Sixnet had destroyed the design records and production records of the products that had been supplied and manufactured, the whole proceeding was corrupted and Westcode's ability to present a case was severely prejudiced.

105.     As to, for example, the design and testing phase of the product, which is a phase that the Arbitrator placed great emphasis on in his Opinion, the case turned into a rank swearing contest by Sixnet's representatives.   Sixnet's representatives argued, without any documentation to support their argument, or any incisive documentation or other evidence available to Westcode to probe the argument, that the substandard components utilized in the few remaining subassemblies and pieces of subassemblies that were available at the time of the arbitration, were actually contained in design copies of the products.   While there was physical evidence which undermined the credibility of that contention, Westcode was substantially prejudiced by not having the design records or the production records available.

106.     Without the design documents, the futility into which the Arbitrator permitted

the proceeding to turn, can best be exemplified in an exchange between Westcode's counsel and Mr. Schoenberg during an examination of some of the remaining physical product during the hearing.  The examination centered around the fact that two identical boards contained similarly placed components made by different manufacturers, with different temperature ratings.  TR/H/p. 345.  When counsel for Westcode asked Mr. Schoenberg to identify whether the components made by different manufacturers were both contract compliant, he stated that they "most certainly" are.  TR/H/p. 346.  Since, obviously, the temperature certification documents had been "destroyed", counsel for Westcode asked Mr. Schoenberg how he could make such a statement with such certainty.  The explanation was:

> I know they are interchangeable because they are both
> qualified parts or they wouldn't be on those boards.

The same circular logic applied when Mr. Schoenberg was presented with three boards with identical component parts manufactured by three different manufacturers from three different countries.  TR/H/p. 348.

107.   Westcode renewed its motion for spoliation sanctions on December 31, 2002 at the conclusion of the arbitration.  That motion was never decided.  See, the December 31, 2002 letter brief from counsel for Westcode to Arbitrator Rutter which is attached as part of the undisputed record at Exhibit "FF".

108.   The design phase of the product is a circumstance on which the Arbitrator placed heavy reliance in determining that the subassemblies were contract  compliant.

109.   The circumstantial evidence irrefutably proves that the contention that the substandard components were approved for use in the design of the product is false.  In

24

fact, as a matter of law, the design phase of the product, in light of the clear contract language, is legally meaningless.  Nevertheless, the Arbitrator placed great emphasis on that phase of the product and to the extent the Arbitrator's position had any merit, the design and production documents, which would have shown temperature ratings of the components that were used, and whether they complied with the contract specifications, were critical.

110.    The Arbitrator ruled that Westcode's claim that Sixnet's products were non-compliant was false because the product had obtained a First Article approval and the products were tested.  The only evidence the Arbitrator could have relied on was the anecdotal testimony by Mr. Schoenberg to the effect that the components were compliant otherwise Sixnet would not have used them.  If Westcode was going to be put to the task of challenging such a circular argument, it had no footing absent Sixnet's design and production documents.  Westcode, however, should never have found itself in a position of having to disprove the Sixnet's design without the design documents.  Accordingly, the Arbitrator should never have permitted Sixnet's case to proceed or, in the alternative, Sixnet' claims should have been dismissed or denied at the conclusion of the hearing when the extent of Westcode's prejudice became manifestly clear.

## III.    SUMMARY OF THE ARBITRATOR'S DECISION

111.    The Arbitrator found that Sixnet was not in breach of any of its contractual obligations.  ACL, ¶ 7.  In so doing, the Arbitrator either did not address Westcode's express warranty defenses or the Arbitrator must have ruled that the product supplied by Sixnet was somehow contract compliant.  The contractual specifications with which the Arbitrator would have had to have concluded the product complied were never identified.

25

112.    The Arbitrator then awarded Sixnet "contract compensatory (<u>Hadley v. Baxendale</u>) damages" in the amount of $1,075,911.60.  ACL, ¶¶ 8 & 9.  The amount of the award includes interest from July 15, 2001 in the amount of $164,122.11.  <u>Id.</u>

113.    The Arbitrator did not anywhere in the Award address the effect of the termination-for-convenience provision which was incorporated into the parties' Agreement.

114.    As mentioned above, the Arbitrator never decided Westcode's renewed motion for spoliation.  In fact, not only was Sixnet not sanctioned as a result of the its destruction of the design and production records but, indeed, the inferences deducible from the lack of such documentation most definitely went to the spoliator - Sixnet.

## IV.    CONCLUSION

For the reasons set forth more fully in the accompanying memorandum of law, Westcode, Inc. respectfully requests that the Arbitrator's July 15, 2003 Award be vacated and/or modified.

Respectfully submitted,

**PHILLIPS & CAMPBELL, P.C.**

_____
Patrick C. Campbell, Jr.
ID No. 53350
314 N. Middletown Road
Lima, PA  19037
610/548-710
Attorneys for Westcode, Inc.

**Dated:**        September 5, 2003
G:\WESTCODE\adv. SIXNET\LP\westcode.undisputed.fact.wpd

26